**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DAVID JANSSEN, Derivatively on Behalf of Nominal Defendant CAMPING WORLD HOLDINGS, INC., | Case No. |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| MARCUS A. LEMONIS, THOMAS F. WOLFE, BRENT L. MOODY, STEPHEN ADAMS, ANDRIS A. BALTINS, BRIAN P. CASSIDY, MARY GEORGE, HOWARD A. KOSICK, MICHAEL W. MALONE, JEFFREY A. MARCUS, K. KILLON SCHICKLI, CRESTVIEW PARTNERS II GP, L.P., and CRESTVIEW ADVISORS, L.L.C., | |
| Defendants, | |
| and | |
| CAMPING WORLD HOLDINGS, INC., | |
| Nominal Defendant. | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff David Janssen ("Plaintiff" or "Janssen"), by and through his undersigned attorneys, brings this shareholder derivative action for the benefit of Nominal Defendant Camping World Holdings, Inc. ("Camping World" or the "Company"), against certain of the Company's officers and members of the Board of Directors (the "Board") seeking to remedy Defendants' (as defined below) violations of §14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), violations of § 10(b) and/or 20(a) of the Exchange Act and Rule 10b-5

promulgated thereunder, breaches of fiduciary duties, unjust enrichment, abuse of control, and gross mismanagement. Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Camping World and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review of news articles, shareholder communications, and postings on Camping World's website; (c) review of the pleadings and other documents in the securities class action captioned *Ronge v. Camping World Holdings, Inc.*, Case No. 1:18-cv-07030 (N.D. Ill.) (the "Securities Class Action"); and (d) review of other publicly available information concerning Camping World and the Defendants. Plaintiff believes that through reasonable discovery, substantial additional evidence will exist for the allegations and claims set forth herein.

## I.     SUMMARY OF THE ACTION

1.     Beginning March 8, 2017 and continuing through the present (the "Relevant Period")[1], Defendants took Camping World public in order to cash out a share of their massive holdings in Camping World. The Company's initial public offering ("IPO") took place in October 2016, and thereafter Defendants made a number of false and misleading statements that artificially inflated the price of the Company's Class A common stock. Defendants made false and misleading statements regarding the Company's financial performance, the effectiveness of internal controls to ensure accurate financial reporting, and the success and profitability of the integration and rollout of Gander Mountain stores that the Company had recently acquired out of

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately March 8, 2017 to August 8, 2018; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

bankruptcy. Defendants then profited from the false and misleading statements by selling Camping World stock at inflated prices.

2.     Despite Camping World's reassuring statements about the Company's performance and the integration of Gander stores, less than two years after the IPO defendants admitted that the Company's publicly filed financial statements contained several errors as a result of numerous material weaknesses in its controls over financial reporting and that the rollout of Gander Mountain stores was, in the Chief Executive Officer's ("CEO") own words, a "giant sh** show" that was costing the Company tens of millions of dollars. When these previously undisclosed facts were revealed, Camping World's stock crashed, and the Company's investors suffered hundreds of millions of dollars in losses.

3.     Camping World specializes in the sale of recreational vehicles ("RVs") and services related to RV ownership and maintenance. In 2006, Defendant Marcus Lemonis ("Lemonis") became President and CEO of Camping World. Since then, Lemonis, along with Defendant Stephen Adams ("Adams") and Defendant private equity firm Crestview Partners II GP, L.P. ("Crestview"), obtained significant stakes in the Company, becoming its majority and controlling shareholders.

4.     Because Lemonis', Adams', and Crestview's ownership interests in Camping World were largely illiquid without access to the public markets, they took the Company public. Although the IPO brought the Company into the public marketplace, Camping World remained structured as a functionally private corporation, with Lemonis and the other insiders maintaining majority voting and decision-making power.

5.     Issuing stock and raising money from the public brought with it certain responsibilities. Camping World now had to publicly issue financial statements, and Defendants

had to truthfully answer questions from analysts and investors about the business. Defendant Lemonis admitted his distaste for the disclosure obligations of being a public company, saying at the end of the Relevant Period that he was "used to holding all my cards so I can sucker punch my competitor." This inclination to keep information private led defendants to fraudulently conceal material negative information from the investing public.

6.      The Relevant Period begins on March 8, 2017, when Defendants issued Camping World's financial statements for the year and quarter ended December 31, 2016. Unbeknownst to the Company's public investors, the financial statements concealed that the Company suffered numerous material weaknesses in its internal controls, reported basic earnings per share ("EPS") that were inflated by over 37%, and reported net income that was inflated by nearly 20%. Defendants persisted to hide this information during the Relevant Period by stating the Company's internal controls were effective and repeating the overstated 2016 financial results.

7.      Additionally, in May 2017, Defendants announced that Camping World was extending its business into outdoor retail sales. In particular, Defendants announced that the Company was the winning bidder to obtain the rights to Gander Mountain stores out of bankruptcy, which would be rebranded as Gander Outdoors ("Gander"). To validate purchasing a chain of stores that had gone bankrupt, defendants stated they would only "open stores that have a historical level of profitability" and that the purchase would not hurt, but would maintain, profit margins. Defendants repeatedly boasted about the integration and rollout of stores, stating that "early trends in these stores have been very promising," and that Camping World's systems allowed them to "stock the right products at the necessary locations, all at the right time and in the correct quantity." In truth, Defendants concealed material, negative facts from investors concerning the increased costs and technological incompatibility of integrating high volume,

lower-value Gander items into Camping World's inventory and distribution systems designed for its lower-volume, high-value RV business. These failures caused significant cost increases, including increased labor costs, delayed inventory stocking, distribution of less-desirable products, and related matters that delayed store openings and negatively impacted profit margins. In fact, several Gander stores were closed just months after reopening due to these concealed integration failures and the selection of poor-performing stores.

8.      Despite the dysfunction taking place behind the scenes, throughout the Relevant Period, Defendants made reassuring statements that hid the increased costs and failures with the Gander stores' integration and rollout. Furthermore, Defendants took advantage of Camping World's artificially inflated share price by performing secondary stock offerings in May 2017, with an offering price that had risen to $27.75 per share, and again in October 2017, with an offering price that had climbed to $40.50 per share. Unlike the IPO, these secondary offerings were not intended to raise capital for the Company, but primarily to cash out the insiders by selling their stock. Crestview, for example, sold more than 13 million shares of Camping World Class A stock in the secondary offerings for more than $450 million in gross proceeds. The Company's CEO, Chief Financial Officer ("CFO"), Chief Operating Officer ("COO"), and President likewise all cashed out shares of Camping World stock during the Relevant Period at inflated prices, collecting more than $70 million in gross proceeds.

9.      Then, toward the end of the Relevant Period, in a number of corrective disclosures, Camping World stunned investors by disclosing, *inter alia*, that: (i) there were several material weaknesses in the Company's controls over financial reporting, resulting in an overstatement of the Company's financials; and (ii) the Company's integration and rollout of Gander stores had suffered severe operation setbacks, with substantially higher costs that were

negatively impacting the Company's profit margins by tens of millions of dollars. The Gander store failures were the result of the incompatibility of the inventory and distribution systems Camping World used for its existing low volume RV business and the newly acquired high-volume, lower-value Gander retail inventory. Those severe operational issues, which defendants knew or recklessly disregarded in conducting due diligence prior to the Gander acquisition, led to delayed store openings and stores being rushed open with less desirable inventory.

10.     Subsequent to the corrective disclosures, the Company's Class A common stock, which had traded above $47 per share during the Relevant Period, dropped to $19 per share and now trades at approximately $11 per share.  The drastic decline in Camping World's stock price stands in stark contrast to the positive performance of the overall stock market during this period.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

12.     Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including Defendants' participation in the wrongful acts detailed herein, occurred in this district.  One or more Defendants either resides in or maintains offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous improper activities detailed herein and conducting business here, which had a material effect in this district.

13.     This Court has jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in and maintains operations in this

District, or is an individual who has sufficient minimum contact with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein occurred in this District. Further, Camping World is incorporated in this District.

## III.     THE PARTIES

15.     Plaintiff has continuously been a shareholder throughout the period of the wrongdoings complained of herein, and is a current shareholder.

16.     Defendant Camping World is a retailer of RVs and outdoor supplies and accessories headquartered in Lincolnshire, Illinois. The Company's Class A common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CWH."

17.     Defendant Marcus A. Lemonis ("Lemonis") has been the Chairman of the Board and CEO of Camping World since the Company's IPO. In his role as CEO for fiscal year 2018, Defendant Lemonis received $9,109 in total compensation. Defendant Lemonis has been a director of the Company since 2011.

18.     Defendant Thomas F. Wolfe ("Wolfe") has been the CFO of Camping World from the Company's IPO until January 2019. In his role as CFO for fiscal year 2018, Defendant Wolfe received $2,002,368 in total compensation.

19.     Defendant Brent L. Moody ("Moody") has been the COO and a member of the Board of Camping World from the Company's IPO until October 2018. In his role as COO for fiscal year 2018, Defendant Moody earned $2,441,809 in total compensation.

20.     Defendants Lemonis, Wolfe, and Moody are referred to herein as the "Officer Defendants."

21.     Defendant Stephen Adams ("Adams") has been a director of the Company since 2011.  Defendant Adams, along with Lemonis, controls ML acquisition, through which they own approximately 47% of Camping World's Class B stock.

22.     Defendant Andris A. Baltins ("Baltins") has been a director of the Company since 2011. Defendant Baltins has been the Chair of the Company's Nominating and Corporate Governance Committee since at least February 2018 and served as a member of the Audit Committee until at least August 2017.

23.     Defendant Brian P. Cassidy ("Cassidy") has been a director of the Company since 2016.  Defendant Cassidy has been a member of the Company's Nominating and Corporate Governance Committee since at least February 2018.   Defendant Cassidy is a partner at Crestview Partners and is also a partner in Crestview Advisors, LLC.

24.     Defendant Mary George ("George") has been a member of the Board of Camping World since 2017. Defendant George is a member of the Board's Audit Committee.

25.     Defendant Howard A. Kosick ("Kosick") was a director of the Company from 2017 until 2018. Defendant Kosick was a member of the Board's Audit Committee until at least November 2017.

26.     Defendant Michael W. Malone ("Malone") has been a director of the Company since 2019.

27.     Defendant Jeffrey A. Marcus ("Marcus") has been a director of the Company since 2016. Defendant Marcus is a member of the Company's Compensation Committee.

Defendant Marcus is the Vice Chairman of Crestview Partners and is also a partner in Crestview Advisors, LLC.

28.     Defendant K. Dillon Schickli ("Schickli") has been a director of the Company since 2011. Defendant Schickli is the Chair of the Company's Audit Committee and a member of the Compensation Committee.

29.     Defendants Lemonis, Adams, Baltins, George, Malone, Cassidy, Marcus, Kosick and Schickli are collectively referred to herein as the "Director Defendants."

30.     The Director Defendants, along with the Officer Defendants, are collectively referred to herein as the "Individual Defendants."

31.     Defendant Crestview Partners II GP, L.P. ("Crestview") is a private equity firm headquartered in New York City, New York. Throughout the Relevant Period, Crestview and its affiliates held a substantial ownership stake in the Company and, together with Lemonis, controlled its actions. Crestview also has several agreements and financial arrangements with the Company, both directly and through various affiliates.

32.     Defendant Crestview Advisors, L.L.C. ("Crestview Advisors") is a registered investment adviser to private equity funds, including the funds affiliated with Crestview that invested in Camping World. Defendants Crestview and Crestview Advisors, together with their affiliates, are collectively referred to herein as the "Crestview Defendants."

## IV.     EVENTS LEADING UP TO THE RELEVANT PERIOD

### A.     Camping World Prior to the IPO

33.     Defendant Lemonis ascended to the top of Camping World through prior relationships and involvement in the RV industry. Notably, he has been accused of making

misrepresentations in prior business dealings, as he, among other things, ran and then fled an RV company that was headed toward a collapse.

34.     Camping World was founded in 1966, and has developed through a series of acquisitions since that time. Camping World sells RVs, RV-related services, such as roadside assistance and protection plans, and RV-related products and accessories. Additionally, the Company also owns Good Sam, which cross-sells products and services to RV owners and an RV membership service through its "Good Sam Club."

35.     Camping World had been long financially backed by Defendant Adams, a private equity investor who served as the Chairman of various Camping World predecessors since the 1980s. In or around 2002, Adams aimed to acquire a struggling and cashed-strapped RV business, Holiday RV Superstores ("Holiday RV"), which was run by Defendant Lemonis. As Holiday RV became progressively insolvent in 2003, Adams loaned it money and acquired shares, becoming the largest shareholder. Around the same time, Lemonis resigned from Holiday RV and co-founded FreedomRoads, LLC ("FreedomRoads") another RV dealership business financially backed by Adams.

36.     Within a year, Holiday RV was delisted from the NASDAQ, and Holiday RV sued Lemonis for breaches of contract and fiduciary duty. Subsequently, Adams acquired all shares of Holiday RV. Other Holiday RV investors alleged that Lemonis made misrepresentations to secure loans prior to his resignation.

37.     Lemonis then grew FreedomRoads through the rapid acquisition of RV dealerships. In 2006, Camping World and FreedomRoads developed a joint venture and Lemonis became the CEO and President of both companies.

38.     In 2011, Camping World formally merged with FreedomRoads, creating the largest RV dealership business and provider of products and services for RVs in North America. Lemonis remained CEO and President of the combined entity. Lemonis' intention to keep information secret was discussed in describing the business combination. The RV Daily Report noted that the combination was "done in complete secrecy," and, as a result of the deal, Adams' investment group would no longer "publicly release its financial statements – documents that helped the industry understand the direction the company was headed." The publication concluded, "[u]ndoubtedly, Lemonis has decided that he's had enough of RV Daily Report releasing information to his customers and competitors . . . he wants to keep his cards close to his vest."[2]

39.     Over time, Lemonis obtained a massive stake in Camping World. Similarly, in or around 2011, the Crestview Defendants made numerous investments in Camping World, ultimately securing significant ownership holdings. As of Camping World's October 2016 IPO, Defendant Lemonis, Defendant Adams, and the Crestview Defendants jointly majority owned and controlled the Company.

40.     Defendants issued the IPO to raise money from the public, but they did not want to give up their control. Through pre-IPO transactions entered with Camping World and its subsidiaries, Lemonis, Adams, and the Crestview Defendants entrenched their majority ownership interests and ability to control the Company after the IPO, even if their exposure to the economic risks of share ownership substantially declined.

41.     First, to retain voting control, the above Defendants implemented a multi-share class structure with Classes A, B, and C shares. Only Class A shares are publicly traded. Classes

---

[2] Greg Gerber, *Stephen Adam Doubles Down on Marcus Lemonis*, RV Daily Report, Jan. 20, 2011, at 1.

B and C shares provide voting rights, but do not have an economic interest. Through their ownership of Classes A, B and C shares, Lemonis, Adams, and the Crestview Defendants collectively retained more than 85% of the voting control over the Company, while outside investors, who hold only Class A shares, remained subject to a majority of the economic risk.

42.     Second, Lemonis, Adams, and the Crestview Defendants also have the right to appoint a majority of Camping World's Board. Following a voting agreement, the Crestview Defendants have the right to appoint up to four directors, Defendants Lemonis and Adams have the right to appoint up to four directors through their indirect ownership of certain entities, and Defendant Lemonis has the right to appoint one director through his ownership of the only Class C share. Under the voting agreement, the number of directors these parties are entitled to designate depends on their ownership of Camping World stock. At all relevant times, Defendants Lemonis, Adamns, and the Crestview Defendants have had the power to designate at least seven members of Camping World's Board, and they have maintained majority voting power to approve all of the Company's directors.

**B.     The Camping World IPO**

43.     Camping World's IPO was issued on October 6, 2016 and raised $261 million (less underwriter fees and discounts). Lemonis was appointed Chairman and CEO, Wolfe was appointed CFO, Moody was appointed COO, and Roger Nuttal was appointed President. As discussed above, the agreements and structure of the IPO allowed Lemonis and the Crestview Defendants to reap the benefits of taking Camping World public, but maintain the structure and control of a privately held company. As one expert stated upon reviewing Camping World's IPO documents, "[c]learly [Lemonis] wants to retain the benefits of private ownership but gain access to public markets. It's a win-win for him but a lose-lose for anybody on the outside."

44.     Furthermore, unbeknownst to Camping World's public investors, the Company lacked the necessary infrastructure, including internal and disclosure controls, to meet the reporting requirements of a publicly-traded company. For example, as Defendants would later admit, Camping World:

- had material weaknesses in internal controls, including deficient tax controls, inadequate policies and procedures in the FreedomRoads segment, ineffective transaction level and management review controls, and insufficient documentation of certain accounting policies and procedures; and

- had made several accounting errors, including failing to properly defer portions of certain revenue, apply vendor rebates against inventory, allocate intercompany revenue, and allocate intercompany markup costs.

### C.     Camping World's Acquisition of Gander Stores

45.     Gander Mountain was a big box retailer that did not sell RVs, but sold hunting and fishing equipment and related items for outdoor enthusiasts. Prior to filing for bankruptcy, Gander Mountain had operated 160 retail stores. Similar to other retail businesses, Gander was being hurt by online sales. According to Gander Mountain's bankruptcy filings, it had "encountered substantial headwinds as sales ha[d] shifted from traditional brick and mortar retailers to online sellers." In March 2017, Gander Mountain filed for Chapter 11 bankruptcy and announced that it would close and liquidate "underperforming or unprofitable" store locations while proceeding to operate others through bankruptcy.

46.     Camping World's leadership viewed Gander Mountain as a platform through which they could cross-sell RVs to outdoor hobbyists. Despite Camping World's accounting failures described above, in May 2017, Camping World announced that it was expanding, as it had obtained assets of Gander Mountain out of bankruptcy. Camping World, upon acquiring Gander Mountain assets, announced that it would close all stores and liquidate all inventory.

Camping World announced that it would reopen approximately 70 "historically profitable" Gander stores.

47.     The decision to close all stores and liquidate inventory forced customers to find new suppliers for their outdoor goods and they would have to be won back upon store re-openings. As the delays in re-opening became longer, the challenge of winning back the customers became more significant. Additionally, the decision to liquidate inventory and rebuy inventory using Camping World's systems, rather than continuing to function on Gander Mountain's inventory systems with Gander Mountain inventory, meant that Camping World would face increased inventory restocking, distribution, and personnel hiring challenges.

48.     Camping World incurred significant expense due to the issues integrating the Gander stores into Camping World's inventory and distribution systems. Integrating Gander's high volume, low-cost products into Camping World's systems on a rapid timeline caused major dysfunction, leading Camping World to transport and pay busloads of Gander employees and contractors to manually input thousands of stock keeping units ("SKUs") that tracked product inventory and sales into those systems. This led to inventory ordering delays and inefficiencies at Gander's distribution center.

49.     The risks of using Camping World systems for Gander inventory were known or recklessly disregarded by Defendants who made such decisions after conducting due diligence into the Gander Mountain acquisition. Due to the stark differences between Camping World's existing RV dealerships and Gander Mountain's large retail stores, any reasonable due diligence by Camping World would include an investigation of the compatibility of Camping World's existing inventory management and distribution systems and the inventory and distribution necessary to open and run Gander Mountain stores.

50.     As such, in performing due diligence on the Gander Mountain acquisition, and based on their public statements concerning the strategy to close, liquidate inventory, and then re-open stores, Defendants knew or recklessly disregarded the risks of increased costs as a result of the incompatibility of Camping World's inventory and distribution systems with Gander's business and the need to completely restart inventory and distribution practices. Even so, Defendants concealed not only these risks during the Relevant Period, but also that they were beginning to materialize.

## V.     THE BOARD ISSUES THE MATERIALLY MISLEADING PROXY STATEMENT

51.     On March 29, 2018, Defendants Baltins, Marcus, Cassidy, Kosick, Lemonis, Adams, George, and Schickli caused the Company to file its 2018 Proxy with the SEC for the Company's Annual Meeting of Stockholders held on May 16, 2018.  In the 2018 Proxy, the above named Defendants solicited stockholder votes to, among other things, elect Defendants Baltins, Marcus, and Moody to the Board.  Defendants negligently issued materially misleading statements with respect to these solicited votes.

52.     In support of reelecting Defendants Baltins, Marcus, and Moody to the Board, the 2018 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations and finances; and (ii) the Audit Committee exercised oversight of the Company's financial statements, and therefore the financial statements were appropriate for the Board to approve to include in the Company's Annual Report.  In particular, the 2018 Proxy stated the following:

> Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Board oversees the implementation of risk mitigation strategies by management and encourages management to promote a culture that incorporates risk management into our corporate strategy and day-to-day business

operations. Management discusses strategic and operational risks at regular management meetings and conducts specific strategic planning and review sessions during the year that include a focused discussion and analysis of the risks we face, including cybersecurity risks. Throughout the year, senior management reviews these risks with the Board at regular board meetings as part of management presentations that focus on particular business functions, operations or strategies, and presents the steps taken by management to mitigate or eliminate such risks. Our Board is apprised of particular risk management matters in connection with its general oversight and approval of corporate matters and significant transactions. Our Board administers this oversight function, including the oversight of cybersecurity risks, directly through the Board as a whole, as well as through various standing committees of the Board that address risks inherent in their respective areas of oversight. The Board does not believe that its role in the oversight of our risks affects the Board's leadership structure.

53.    Moreover, the 2018 Proxy included assertions that the Audit Committee reviewed and discussed the Company's financial statements and earnings press releases, and discussed risk assessment and management policies.  Based on this review, the Audit Committee recommended to the Board that the financial statements to be included in the Company's 2017 Form 10-K. The 2018 Proxy stated the following:

**<u>AUDIT COMMITTEE</u>**

Our Audit Committee's responsibilities include, but are not limited to:

- appointing, retaining, overseeing, approving the compensation of, and assessing the independence of our independent registered public accounting firm and any other registered public accounting firm that may be engaged for audit, attestation and related services;
- reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures;
- discussing the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies;
- discussing with the independent registered public accounting firm audit problems or difficulties;
- discussing our risk assessment and management policies;
- reviewing and approving related person transactions;
- reviewing and pre-approving audit and non-audit services proposed to be performed by the independent registered public accounting firm, as further described on page 16 of this proxy statement; and

- establishing procedures for the confidential anonymous submission of concerns regarding questionable accounting or auditing matters.

*        *        *

**Report of the Audit Committee of the Board of Directors**

The Audit Committee has reviewed Camping World's audited financial statements for the fiscal year ended December 31, 2017 and has discussed these financial statements with management and Camping World's independent registered public accounting firm. The Audit Committee has also received from, and discussed with, Camping World's independent registered public accounting firm various communications that such independent registered public accounting firm is required to provide to the Audit Committee, including the matters required to be discussed by statement on Auditing Standards No. 1301, as adopted by the Public Company Accounting Oversight Board ("PCAOB").

Camping World's independent registered public accounting firm also provided the Audit Committee with a formal written statement required by PCAOB Rule 3526 (*Communications with Audit Committees Concerning Independence*) describing all relationships between the independent registered public accounting firm and Camping World, including the disclosures required by the applicable requirements of the PCAOB regarding the independent registered public accounting firm's communications with the Audit Committee concerning independence. In addition, the Audit Committee discussed with the independent registered public accounting firm its independence from Camping World.

Based on its discussions with management and the independent registered public accounting firm, and its review of the representations and information provided by management and the independent registered public accounting firm, the Audit Committee recommended to the Board that the audited financial statements be included in Camping World's Annual Report on Form 10-K for the fiscal year ended December 31, 2017.

54.    Defendants' statements misleadingly suggested that the Board: (i) maintained sufficient compliance, review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks: (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.   The 2018 Proxy omitted any disclosures that: (i) there were several material weaknesses in the Company's controls over financial reporting, resulting in an overstatement of the Company's financials; and (ii) the

Company's integration and rollout of Gander stores was experiencing difficulties, with substantially higher costs that were negatively impacting the Company's profit margins by tens of millions of dollars.

55.     The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  Most importantly, the Company was incorrectly boosting its short-term revenues and earnings at the expense of maintaining capital assets, and therefore, its financial statements were not appropriate to include in the Company's Annual Report. Defendants Baltins, Marcus, Cassidy, Kosick, Lemonis, Adams, George, and Schickli were negligent in making these misleading statements in the 2018 Proxy.

## VI.     ADDITIONAL FALSE AND MISLEADING RELEVANT PERIOD STATEMENTS

56.     Throughout the Relevant Period, Defendants made false and misleading statements concerning the true condition of the Company's internal controls, historical accounting results, and the costs and success of the Gander store integration and rollout. Defendants repeatedly assured investors that the Company's internal controls were adequate, its accounting complied with generally accepted accounting principles ("GAAP"), Gander stores were being selected based on historical profitability, and the integration and rollout of Gander stores was a success and would not have a negative impact on financial performance. The Relevant Period begins on March 8, 2017, when Camping World announced its fourth quarter and full year 2016 financial results.

### A.     False and Misleading Statements Regarding Internal Controls and Financial Results

57.     On March 8, 2017, Camping World issued a release announcing its results for the fourth quarter and year ended December 31, 2016, which was filed with the SEC on Form 8-K

("FY 2016 Release"). The FY 2016 Release contained the following false and misleading statements:

(a)     The FY 2016 Release reported: ***basic earnings per share for the period of October 6, 2016 to December 31, 2016 of $0.11; diluted earnings per share for the period of October 6, 2016 to December 31, 2016 of $0.09; fourth quarter 2016 total net income of $13.6 million***; and ***fourth quarter net income attributable to Camping World, and excluding noncontrolling interests, of $2.06 million***[3] (collectively, "Overstated EPS and Net Income Statements"); and

(b)     The FY 2016 Release stated that the financial results therein "***are presented in accordance with accounting principles generally accepted in the United States ('GAAP')***."

58.     On March 13, 2017, Camping World filed with the SEC its annual report on Form 10-K for the year ended December 31, 2016 ("2016 10-K"). The 2016 10-K was signed personally or by power of attorney by Defendants Lemonis, Wolfe, and Adams and contained the following false and misleading statements:

(a) The 2016 10-K repeated the ***Overstated EPS and Net Income Statements*** set forth above;

(b) The 2016 10-K stated that Defendants Lemonis and Wolfe had reviewed the Company's disclosure controls and procedures and "***concluded that [the Company's]***

---

[3] The false and misleading statements are addressed herein topically and in chronological order within each topic. However, the entirety of false and misleading statements must be considered in totality, because each of them served to reinforce the false and misleading nature of the others, and caused Camping World's stock price to be artificially inflated. Emphasis (bold and italics) has been added to highlight the particular statements alleged to be false and misleading statements in this section.

*disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2016*" ("Disclosure Controls Statement");

(c)   The 2016 10-K stated that "*[t]here was no change in our internal control over financial reporting . . . identified in connection with the evaluation of our internal control performed during the fiscal quarter ended December 31, 2016, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting*" ("Internal Controls Statement");

(d)   The 2016 10-K stated that the consolidated financial statements contained therein were "*prepared and presented in accordance with accounting principles generally accepted in the U.S. ('GAAP')*" ("Compliance with GAAP Statement"); and

(e)   The 2016 10-K included signed certifications by Defendants Lemonis and Wolfe attesting that the 2016 10-K did not contain any untrue statements of material fact, or omit to state a material fact, and vouching for the accuracy of the Company's financial reports and effectiveness of its disclosure controls and internal controls. The certifications stated:

**Exhibit 31.1**

**CERTIFICATIONS**

I, Marcus A. Lemonis, certify that:

1. I have reviewed this Annual Report on Form 10-K of Camping World Holdings, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

    (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) [Omitted]

    (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and;

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 13, 2017

By: /s/ Marcus A. Lemonis
    Marcus A. Lemonis
    Chairman and Chief Executive Officer
    (Principal Executive Officer)

(f)  In particular, the representations in ¶¶2-3 of the signed Certifications (regarding the accuracy of the 2016 10-K and the financial results reported therein) and ¶¶4-5 of the signed Certifications (regarding the design and effectiveness of internal controls and lack of material weaknesses) of the foregoing certification were false and misleading when made ("Signed Certification Statements").

59.     On May 4, 2017, Camping World filed with the SEC its quarterly report on Form 10- Q for the quarter ended March 31, 2017 ("1Q17 10-Q"). The 1Q17 10-Q was signed by Defendant Wolfe and contained the following false and misleading statements:

(a)   The 1Q17 10-Q contained essentially the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** above; and

(b)   The 1Q17 10-Q included ***Signed Certification Statements*** by Defendants Lemonis and Wolfe in substantially the same form as above.

60.     On May 26, 2017, Camping World filed with the SEC a prospectus on Form 424(b)(4) in connection with the May 2017 Offering, which was part of a registration statement signed personally or by power of attorney by Defendants Lemonis, Wolfe, and Adams. The prospectus incorporated by reference the 2016 10-K, which included the same ***Overstated EPS and Net Income Statements*** as above; the same ***Disclosure Controls Statement and Internal Controls Statement*** as above; the same Signed Certification Statements by Defendants Lemonis and Wolfe as above; and the same ***Compliance with GAAP Statement*** as above.

61.     On August 10, 2017, Camping World filed with the SEC its quarterly report on Form 10-Q for the quarter ended June 30, 2017 ("2Q17 10-Q"). The 2Q17 10-Q was signed by Defendant Wolfe and contained the following false and misleading statements:

(a)    The 2Q17 10-Q contained essentially the same Disclosure Controls Statement and Internal Controls Statement as above; and

(b)    The 2Q17 10-Q included Signed Certification Statements by Defendants Lemonis and Wolfe in substantially the same form as above.

62.     On October 27, 2017, Camping World filed with the SEC a prospectus on Form 424(b)(4) in connection with the October 2017 Offering, which was part of a registration

statement signed personally or by power of attorney by Defendants Lemonis, Wolfe, and Adams. The prospectus incorporated by reference the 2016 10-K which included the same ***Overstated EPS and Net Income Statements*** as above; the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** as above; the same ***Signed Certification Statements*** by Defendants Lemonis and Wolfe as above; and the same ***Compliance with GAAP Statement*** as above.

63.     On November 9, 2017, Camping World filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2017 ("3Q17 10-Q"). The 3Q17 10-Q was signed by Defendant Wolfe and contained the following false and misleading statements:

(a)     The 3Q17 10-Q contained essentially the same ***Disclosure Controls Statement*** and ***Internal Controls Statement*** as above; and

(b)     The 3Q17 10-Q included ***Signed Certifications Statements*** by Defendants Lemonis and Wolfe in substantially the same form as above.

64.     The above statements were materially false and misleading when made. The true facts, which were then known to or recklessly disregard by Defendants, were:

(a)     As of March 8, 2017, and continuing thereafter, the Company's internal controls and disclosure controls were not adequate but in fact suffered from several material weaknesses, including: (i) deficient tax controls; (ii) inadequate accounting policies and procedures in the FreedomRoads reporting segment; (iii) ineffective transaction-level and management review controls over the valuation of trade-in unit inventory; and (iv) insufficient documentation of certain accounting policies and procedures within the retail segment;

(b)     As of March 8, 2017, and continuing thereafter, the Company's internal controls were not effective and the Company suffered material weaknesses that resulted in

Camping World having failed to properly: (i) defer a portion of roadside assistance policies; (ii) apply vendor rebates against related inventory balances; (iii) allocate intercompany revenue from new and used vehicles to consumer services and plans; and (iv) allocate intercompany markup costs applicable to new and used vehicles;

(c)     The Company's historical financial results reported in the 2016 Form 10-K had not been prepared and reported in accordance with GAAP; and

(d)     Due to the numerous errors, misstatements, and material weaknesses listed in (a)-(c) above, the Company's financial statements included in the 2016 Form 10-K could not be relied on and its reported financial results were materially overstated, including: (i) basic EPS for the period from October 6, 2016 to December 31, 2016 were only $0.08 per share, rather than the $0.11 represented, an overstatement of more than 37%; (ii) diluted EPS for the period from October 6, 2016 to December 31, 2016 were only $0.07 per share, rather than the $0.09 represented, an overstatement of more than 28%; (iii) total net income for the three months ending December 31, 2016 was only $11.53 million, rather than the $13.6 million represented, an overstatement of more than 18%; and (iv) net income attributable to Camping World, and excluding non-controlling interests, for the three months ending December 31, 2016 was only $1.59 million, rather than the $2.06 million represented, an overstatement of more than 29%.

**B.     False and Misleading Statements Regarding the Integration of Gander Stores**

65.     On May 1, 2017, Camping World issued a press release announcing that the Company had been selected as the winning bidder at a bankruptcy auction for certain assets of Gander Mountain. Defendants stated their plan was to liquidate the inventory of all stores and maximize profitability through inventory and store location selection.

66.     The May 1, 2017 press release quoted Defendant Lemonis as claiming that the

deal allowed Camping World to focus on opening only the profitable stores, stating:

> *The structure of our deal provides much flexibility and will not only allow us to*
> *refine the inventory selection and select only those stores which are profitable*
> *or we believe have a clear path to profitability*, but will also allow us to
> immediately offer our comprehensive portfolio of services, protection plans,
> products and resources to the existing Gander Mountain and Overton customer
> base and in stores in which we elect to operate.

67.     Regarding the inventory liquidation, the May 1, 2017 press release quoted

Defendant Lemonis as stating:

> *[T]he liquidation of the existing Gander Mountain inventory will allow us to*
> *start with a clean slate of what we consider the appropriate mix and level of*
> *inventory*, including the addition of Camping World . . . offerings where
> appropriate, and our lease designation rights *will allow us to select only those*
> *stores in appropriate locations with appropriate cost structures*.

68.     The May 1, 2017 press release also quoted Defendant Moody discussing the

importance of inventory management and focusing on the stores with an appropriate cost

structure, stating: "*Camping World's plan is to immediately right size the inventory and operate*

*only in retail locations with occupancy costs that we believe support profitable operations, with*

*an extreme focus on corporate overhead and expenses, consistent with our other operating*

*segments*."

69.     On May 8, 2017, Camping World issued another press release offering an update

concerning the Gander acquisition. The release disclosed that Camping World would be opening

seventy Gander stores and reinforced that inventory and store location would be used to

maximize profitability. The May 8, 2017 release quoted Lemonis as stating that,

> [A]fter reviewing the stores in more detail since our successful bid in the
> bankruptcy process, our current goal is operate seventy or more, locations subject
> to, among other things, our ability to negotiate lease terms with landlords on
> terms acceptable to us and approval of the Bankruptcy Court. *The current*
> *liquidation of the existing Gander Mountain inventory will allow us to start*

*with a clean slate of what we consider the appropriate mix and level of inventory*, including the addition of Camping World and Overton's offerings where appropriate.

70.     On June 30, 2017, Camping World issued another press release providing a further update regarding the Gander stores. The press release stated that the list of Gander stores to reopen had been reduced to 57 and provided the list of the first 57 store locations. The June 30, 2017 press release quoted Defendant Lemonis as stating, "*we are not willing to open stores which we do not believe have a clear path to profitability*."

71.     On August 10, 2017, several months into the Gander integration process, Camping World hosted an earnings conference call to discuss the results for the quarter ended June 30, 2017 ("2Q17").

72.     On the call, Defendant Lemonis stated that the Company's "*current plan is to open the initial 15 to 20 Gander stores by the end of 2017*," and added, "*[a]s I've consistently stated, we will only open stores that have a historical level of profitability and also have a clear path to profitability in the future.*"[4]

73.     Regarding Gander store inventory, Defendant Lemonis claimed that Camping World would focus on higher margin, experiential-based products, rather than low margin commodity products, stating that "*we will not carry the level of apparel and footwear that we historically have because we believe that, that is not as experiential. It's more of a commodity based business. And we want to carry the types of products and services that require human interaction with an expert and/or some level of installation or something you need just in time.*

---

[4] Adding to the context of these statements, which reinforce investors' understanding that Defendants would only open Gander stores that had been historically profitable and would maintain profit margins, Defendant Lemonis, in describing the Company's "outdoors" acquisition strategy, stated, "we are still looking for things that have significant earnings behind them, that have significant principles in terms of EBITDA margin contribution consistent with our existing business."

*That is our defense mechanism against margin compression* competing with Amazon-type retailers."

74.    On November 9, 2017, Camping World hosted an earnings conference call to discuss the results for the quarter ended September 30, 2017 ("3Q17"). With regard to Gander store openings, Defendant Lemonis reassured investors that stores were being selected to maintain profit margins, that he set conservative targets, and that defendants had a careful and deliberate plan to focus on stores with clear profitability, stating:

> We feel – Brent Moody and I have really been at the forefront of negotiating those leases. And as we said from day one, we – *the Company will not sign up for any leases that we believe don't give us more than a clear path to profitability; profitability, quite frankly, on a four-wall basis that's consistent with our EBITDA margin expectation, like we currently operate at*.

> One of the things that we've done is we've elected to shrink the size of the boxes that the Company currently – historically had. When they were boxes that were 80,000, 90,000, 100,000, *we elected to pass on those [stores] because we didn't – after analysis, did not like the turning of the inventory and the margins associated with that and the return on capital*. *And so, a lot of the stores that we elected to take have low rent factors* but have slightly smaller footprints: 30,000, 40,000, 50,000, as opposed to 60,000, 70,000, 80,000. *We believe that we're going to be able to generate solid sales, but more importantly, solid profitability out of those*.

> *               *               *

> *We could have probably opened the stores a little earlier. But for Brent and I and the management team, it was about getting the leases right, getting the merchandising right, getting the customer experience right*. And what we want to do is sell experience. And what we won't do is do what some other outdoor retailers have done, which is just sell on price all the time. We believe we have to start with service after the sale as our lead, as opposed to selling solely and singularly on price. So we're very excited about next year.

> I don't have a specific forecast of where we'll be in 2018 because the stores are going to stagger their opening. We're going to work to get 15 to 20 – I think it's going to be closer to 15 – in the first-quarter open. *We want to open them profitability and intelligently*, but they are going to layer in over the year.

One of the things that everybody on this call knows is *I do not set any expectations that I do not think I can absolutely hit*. And it is our expectation that in 2019 that business will do somewhere north of $300 million of revenue. But more importantly, much more importantly, we think the contribution from those 60-some stores would be in the 8% EBITDA margin range. *That is our focus; it's maximizing the EBITDA margin on the revenue*.

75.     In discussing the opening of Gander stores, Defendant Lemonis stated: "The growth of our outdoor categories *will initially come from the opening of stores: the ones that we thought were the most profitable in the markets that could give us the best yield* on our database."

76.     The statements set forth above were materially false and misleading when made. The true facts, which were then known to or recklessly disregard by Defendants, were:

(a)     Contrary to Lemonis' statements that they were focused on maintaining margins through inventory and store location selection, the Gander store pre-opening costs, inventory disruptions, and delays were and would continue to cost millions of dollars that would adversely affect margins;

(b)     Delays in Gander store openings were predicted to adversely impact the profitability of Gander stores, as it would become more and more difficult to win back customers who were in the process of finding alternative suppliers due to store opening delays;

(c)     Contrary to Lemonis' statements that they were passing on store openings and delaying store openings to ensure profitability, store openings were delayed due to integration failures that, for example, required manual entry of thousands of SKUs;

(d)     Contrary to Moody's statements that they would "right size" the inventory and have an "extreme focus" on expenses, the installation of a new operating system and the decision to liquidate all Gander inventory delayed the opening of stores, as the Company

needed to acquire adequate inventory to stock the stores, and the task of stocking inventory was complicated by the fact that Camping World utilized its own distribution practices and technology for inventory management (e.g., SKUs), which were geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(e)     The Company did not "only open [Gander] stores that had a historical level of profitability" or "the most profitable" Gander stores, but rather was intending to rush to open Gander stores that historically were not among the highly profitable and high-performing stores prior to Gander's bankruptcy, and, in some cases, were among the historically worst-performing stores that had and would continue to negatively impact margins;

(f)     Contrary to Lemonis' statement that he did not set expectations that he did not think he could absolutely hit, Lemonis was hiding the material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased preopening store costs; and

(g)     Due to the inventory management failures and Defendants' intention to avoid further postponement of store openings, and contrary to what they told the market, the

Company selected poorer performing stores and could not focus on stocking stores with higher profit margin "experiential" inventory, but rather, needed to fill the stores with commodity products or products (regardless of profitability) based on availability which negatively impacted margins.

77.     On January 4, 2018, Camping World issued a press release providing a list of 69 Gander stores it planned to open in 2018. The press release restated that Defendant "Lemonis previously stated his intention of *operating stores with a clear path to profitability*."

78.     On February 27, 2018, the Company issued a press release announcing its results for the fourth quarter and year ended December 31, 2017, which was filed with the SEC on Form 8-K ("FY 2017 Release"). The FY 2017 Release stated that "*[w]e began opening our first Gander Outdoors stores in December 2017 and are pleased with the early trends*, including Good Sam Club conversion rates at these stores."

79.     On the same day, Camping World hosted an earnings conference call to discuss the results for the full year and quarter ended December 31, 2017. During the call Defendant Lemonis stated:

> *We opened our first Gander Outdoors store in December and currently have 11 stores up and running. Early trends in these stores have been very promising* and we're seeing healthy early conversion rates of Gander customers to our Good Sam Club and our Good Sam credit card. Our plan is to open nearly 72 Gander Outdoor stores by mid-June.
>
> *As I've said many times, we're being very calculated and disciplined in how we open stores and how we manage this business. We are only interested in operating stores that we believe have a clear path to profitability*. We've aggressively negotiated rents, *diversified the mix of merchandise*, added a service department and layered out – on a number of new benefits and savings to our Good Sam Club for the Gander Outdoors and Overton's customers.

80.     Defendant Lemonis provided the Company's financial guidance for 2018, noting the preopening expenses for Gander and confirming they would not negatively impact profit margins, stating:

> Our initial outlook for 2018 calls for revenue in the $4.8 billion to $5 billion range and an adjusted EBITDA in the range of $431 million to $441 million. These estimates include approximately $400 million in revenue for the outdoor and active sports business and *$30 million in preopening expenses for the Gander Outdoors stores.*
>
> *We do not anticipate that Gander Outdoors stores will have much impact on the company's adjusted EBITDA in 2018.* With the Gander Outdoors stores opening in the first half of the year and their peak selling season being the third and fourth quarters, *we would expect the Gander Outdoors stores to be a drag on the adjusted EBITDA in the first half of the year and accretive in the second half of the year*.

81.     In response to a follow-up question regarding the Gander pre-opening expenses, Defendant Lemonis stated:

> *The most important thing for us in this Gander Outdoors opening process was to get it right the first time and so many retailers are in such a hurry to open stuff that they end up signing up for leases that they shouldn't, taking on products that they shouldn't, opening at the wrong time, hiring staff that they shouldn't*. And what I told the team was that we only have one shot to do this. And *by getting the supply chain right* and picking the right vendors *and picking the right locations* and really rolling this out as a nontraditional retail model with a heavy service component and a heavy Good Sam component.

82.     On March 13, 2018, Camping World belatedly filed with the SEC its annual report on Form 10-K for the year ended December 31, 2017 ("2017 10-K"). The 2017 10-K was signed by Defendants Lemonis, Wolfe, and Adams.

83.     Regarding the Gander stores distribution center, the 2017 10-K stated:

> We distribute our Gander Outdoors, Overton's and other Outdoor and Active Sports Retail merchandise from three leased and one owned distribution centers in Greenville, South Carolina, Lebanon, Indiana, St. Paul, Minnesota and Skokie, Illinois, which are 496,443, 707,952, 200,348 and 6,000 square feet, respectively.

*Our distribution centers have scalable systems and processes that we believe can accommodate continued new store growth*. We use an Oracle enterprise system to procure inventory, manage online customer and retail demand and fulfill orders through the warehouse management module. Additionally, we have customized an order packing and shipping software package to handle the specific requirements of the e-commerce and retail business. *We have the capability to both case pick and item pick, which is designed to ensure our retail locations have sufficient quantities of product while also allowing us to maintain in inventory slow moving but necessary items. This balance allows us to stock the right products at the necessary locations, all at the right time and in the correct quantity.*

84.     The 2017 10-K further stated that the Company "*plan[ed] to operate a total of 74 Gander Outdoors stores by May 2018*," and that the Company "*expect[s] to incur approximately $30.0 million in incremental pre-opening expenses in 2018 related to these store openings*."

85.     On May 8, 2018, the Company hosted an earnings conference call to discuss the results of the quarter ended March 31, 2018 ("1Q18"). Defendants made partial disclosures about the true condition of the Gander acquisition and rollout, but Defendant Lemonis continued to make false and misleading statements.

86.     Defendant Lemonis reiterated the Company's 2018 EBITDA guidance, which reflected a lack of any negative impact on margins from the opening of the Gander stores, stating: "*Our [2018] outlook is for* revenue in the $4.8 billion to $5 billion range and *adjusted EBITDA in the $431 to $441 million . . . range*. *These estimates include* approximately $400 million of revenue for the outdoor and active sports businesses and *$34 million of preopening expenses for Gander*."

87.     When asked about the Company's guidance, Defendant Lemonis answered in part:

The Gander Outdoors process, *I intentionally slowed down because I really felt that both the customers and the shareholders wanted to see us execute that*

*strategy for the long term. And so they have not gotten opened as quickly as we wanted them to. And we have not taken the circus approach to opening them by just setting off fireworks and spending a ton of money grand opening them.* We've soft opened them. In some of the markets, they've opened up like a blaze of glory. In other markets, they've been a little slower. . . . But if we believe that there is going to be any adjustment to that second quarter, we promise that we will communicate that. *We're still feeling very confident about our full year.* We just don't know if any of that's going to shift around a little bit, and we'll have some visibility into it over the next, call it, 2, 3 weeks. But *we feel confident with our annual number.*

88.    The statements set forth above were materially false and misleading when made.

The true facts, which were then known to or recklessly disregard by defendants, were:

(a)    Defendant Lemonis did not "intentionally" slow down the opening of Gander stores, but rather delays in opening Gander stores were the result of material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which required the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, and SKUs becoming uncoupled from the products they were supposed to identify;

(b)    Camping World distribution centers did not have scalable systems to "accommodate continued new store growth," but were understaffed and had issues with receiving inventory, lost inventory, and inventory backlogs, causing delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs;

(c)    Delays in Gander store openings would materially affect the profitability of Gander stores, as it would become more and more challenging to win back customers who were in the process of finding alternative suppliers for the products they desired;

33

(d)      The Company was not "calculated" or "disciplined" with the opening process and did not only open stores with a "a clear path to profitability," but due to delays from the failed integration and rollout was rushing to open Gander stores that historically were not among the high-performing stores before Gander's bankruptcy, and, in some cases, were among the historically worst-performing stores;

(e)      The decision to liquidate all Gander inventory delayed the opening of stores, as the Company needed to acquire sufficient inventory to stock the stores and the task of stocking inventory was complicated by the fact that Camping World utilized its distribution practices and technology for inventory management (e.g., SKUs), which were geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(f)      Due to the inventory management failures and Defendants' intention to avoid further delay of store openings, and contrary to what they told the market, the Company could not focus on stocking stores with "the right products . . . at the right time and in the correct quantity" or with the right "mix of merchandise," but rather needed to fill the stores with commodity products or products (regardless of profitability) based on availability, which negatively affected margins;

(g)      Despite the reassuring and optimistic statements concerning Gander integration and rollout, Defendants in truth were rushing to open underperforming Gander stores to conceal delays from the integration and rollout failures and the significantly higher than expected pre-opening costs, and were filling stores with less desirable inventory, as described in subparagraphs (a)-(f) above, each of which negatively affected the Company's profit margins;

(h)     Due to the integration and rollout failures, Camping World was not on track to "operate a total of 74 Gander . . . stores by May 2018" and, in fact, Camping World operated no more than 42 stores by May 2018; and

(i)     As a result of subparagraphs (a)-(h) above, Defendants had no reasonable basis to believe and, in fact, did not believe, that Camping World could achieve 2018 adjusted EBITDA of $431 million to $441 million, pre-opening expenses for Gander stores would only be $30 or $34 million, or that Gander stores would not adversely impact 2018 adjusted EBIDTA.

## VII.   DEFENDANTS' FAILURE TO DISCLOSE INFORMATION REQUIRED UNDER ITEM 303 OF REGULATION S-K

89.     SEC Regulation S-K required that Camping World's annual reports on Form 10-K and quarterly reports on Form 10-Q contain "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A"). According to the SEC, "MD&A is intended to give investors an opportunity to look at the [Company] through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the [Company's] prospects for the future."

90.     Item 303 of SEC Regulation S-K, 17 C.F.R. §229.30 ("Item 303"), specifically required Camping World's Form 10-Ks and Form 10-Qs to describe "any known trends or uncertainties that have had or that [the Company] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii). It also required Camping World's Form 10-Ks and Form 10-Qs to disclose events that would "cause a material change in the relationship between costs and revenues" and "any unusual or infrequent events or transactions or any significant economic

35

changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected." 17 C.F.R. §229.303(a)(3)(i), (ii).

91.     In violation of Item 303, the 3Q17 10-Q, 2017 10-K, and quarterly report on Form 10-Q for the period ended March 31, 2018 ("1Q18 10-Q") , which was filed with the SEC on May 8, 2018 and signed by Defendant Wolfe, failed to disclose material trends, events and uncertainties known to management that were reasonably expected to have a material adverse effect on the Company's resources and results of operations, including:

(a)     The Company had decided to rush to open Gander stores that historically were not among the highly profitable and high-performing stores prior to Gander's bankruptcy, and, in some cases, were among the historically worst-performing Gander stores;

(b)     The Company's decision to liquidate all Gander inventory delayed the opening of stores, as the Company needed to acquire sufficient inventory to stock the stores and the task of stocking inventory was complicated by the fact that Camping World utilized its existing distribution practices and technology for inventory management (e.g., SKUs), which were geared toward large, single items, like RVs and not toward Gander's high volume, smaller products, all of which was increasing the costs of opening the Gander stores;

(c)     Camping World was facing material negative events that occurred during the integration of Gander inventory into Camping World's systems due to inventory, distribution, and technological incompatibility, which necessitated the manual entry of SKUs, the loss of SKUs during the process of uploading into the inventory system, SKUs becoming uncoupled from the products they were supposed to identify, an understaffed

distribution center, difficulties in receiving inventory at the distribution center, lost inventory, and inventory backlogs, resulting in delayed inventory orders, delayed opening of stores, loss of price concessions, and increased pre-opening store costs;

(d)      As a result of the integration and rollout failures, and defendants' intention to avoid further delay of store openings, the Company was filling Gander stores with less desirable inventory such as commodity products or out-of-season products (regardless of profitability) based on availability, which negatively affect margins; and

(e)      The events described in subparagraphs (a)-(d) above, each negatively impacted the Company's profit margins and results of operations.

## VIII.   THE TRUTH BEGINS TO EMERGE

92.      Starting in late February 2018, the truth about Camping World's material weaknesses in internal controls and the Company's serious integration and rollout failures with the Gander stores began to leak out over the course of a series of disclosures, causing massive declines in the price of Camping World Class A common stock.

93.      On February 27, 2018, Camping World conceded it had identified material weaknesses in its internal controls and needed to restate its prior financials. On that day, Camping World issued the FY 2017 Release, announcing its financial results for the fourth quarter and full year 2017. The FY 2017 Release revealed that the Company would need to revise prior reporting periods due to various accounting errors, including: (i) the lack of deferral of a portion of roadside assistance policies sold with the sale of vehicles; (ii) the application of a portion of certain vendor rebates against the related inventory balances; (iii) the removal of the intercompany allocation of certain revenue from new and used vehicles to consumer services and

plans; and (iv) the allocation of the intercompany markup between costs applicable to new and used vehicles.

94.     The FY 2017 Release revealed that the cumulative effect of these misstatements required the Company to (i) restate and reduce its 2016 basic EPS from $0.11 per share to $0.08 per share, as the prior reported basic EPS had been overstated by more than 37%; (ii) restate and reduce its 2016 diluted EPS from $0.09 per share to $0.07 per share, as the prior reported diluted EPS had been overstated by more than 28%; (iii) restate and reduce its fourth quarter 2016 total net income from $13.6 million to $11.53 million, as the prior reported net income had been overstated by more than 18%; and (iv) restate and reduce its fourth quarter 2016 net income attributable to Camping World, excluding non-controlling interests, from $2.06 million to $1.59 million, as the prior reported net income attributable to Camping World, excluding non-controlling interests, had been overstated by more than 29%. The FY 2017 Release further disclosed that the Company was continuing to assess the "potential impact of the recently identified material weaknesses in [Camping World's] internal control over financial reporting."

95.     Following 17 C.F.R. §249.310(a), Camping World was required to file the 2017 10- K on March 1, 2018, but Camping World failed to file by the close of trading on March 1, 2018. After the market closed, Camping World filed a Notification of Late Filing on Form 12b-25 with the SEC, stating that Camping World would be unable to timely file the 2017 10-K due to "material weaknesses in its internal control over financial reporting relating to the insufficient documentation of certain accounting policies and procedures within the Company's retail segment, and ineffective transactional level and management review controls over the valuation of used trade-in inventory," which "required the Company to perform additional procedures and

analyses in connection with the Company's annual financial statement close process and preparation of the Form 10-K."

96.     Upon this news of Camping World's material weaknesses in its internal controls, overstated financial results, and accounting errors, the price of Camping World stock declined significantly. The scale and impact of the material weaknesses in internal controls appeared to be leaked into the market over several days as reflected in unusual trading volume and price declines in the absence of other Company-specific disclosures. In sum, from the close of trading on February 26, 2018 through the close of trading on March 5, 2018, the price of Camping World Class A common stock dropped $5.80 per share, or approximately 13.5%, on abnormally high trading volume.

97.     Thereafter, on March 13, 2018, Camping World belatedly filed its 2017 10-K. In the 2017 10-K, Camping World confirmed that its "previously issued consolidated financial statements as of and for the year ended December 31 2016, and as of and for the three months ended March 31, 2017, three and six months ended June 30, 2017 and three and nine months ended September 30, 2017 . . . should no longer be relied upon." Camping World confirmed in a Form 8-K that its disclosure controls and procedures were not adequate as of December 31, 2016, March 31, 2017, June 30, 2017, September 30, 2017 and December 31, 2017, and that its internal controls over financial reporting were not adequate as of December 31, 2017.

98.     Between the March disclosures set forth above and May 8, 2018, Camping World's stock price dropped from approximately $37 to $27 per share. On May 8, 2018, Camping World reported disappointing financial results for 1Q18. During the quarter, Camping World's adjusted EBITDA margin had decreased from 8.2% in the first quarter of 2017 to 6.8% for the first quarter of 2018. During the conference call to discuss the quarterly results,

Defendant Wolfe claimed that "adjusted EBITDA for the outdoor stores for the first quarter was about $8.9 million loss." Lemonis admitted to opening fewer stores and began to concede the integration problems that led to the delayed Gander store openings and increased costs, stating:

> We've opened up 42 new Gander locations, which admittedly have opened a little later than I anticipated. Given the number of stores we're opening in a relatively short period of time and the fact that we are completely rebuilding the business, the inventory and the staff from scratch, there are challenges on several fronts, including our IT infrastructure, inventory management and distribution systems.

99.     Later in the call, in reply to analyst questions, Defendant Lemonis was more direct in his assessment, disclosing that the behind-the-scenes integration of Gander stores was a "giant sh** show," and revealing the massive inventory, distribution, and technological problems being confronted, and increased labor costs in manually addressing the issues, stating:

> [W]hen I visited the distribution center in Lebanon, I probably have never experienced anything like it. When you take 600,000 square feet of an empty distribution center and you try to add hundreds of thousands of new SKUs and hundreds – and thousands of new vendors and you literally move all that product in on a brand-new operating system that you've never used before and then you have to move all that product out, it was kind of a giant shit show. And we had – luckily, we had store staff from around the country get on school buses in Greyhounds and drive to the distribution center and stay in hotels and RVs and work 14, 15 hours trying to get the product out for their store. I mean, what an unbelievable team effort. But nobody wants to hear that. What they want to know is that it was a perfect process. And it wasn't.

100.    Upon this news, the price of Camping World Class A stock fell $4.60 per share, or 17%, on unusually high trading volume to close at $23.02 per share on May 8, 2018.

101.    In addition, several analysts cut their price targets. For example, in a May 8, 2018 report, analysts from BMO Capital Markets cut their price target by around 30%, citing the disclosures from "a very poorly executed earnings conference call" that could "have a detrimental effect on investors' view of the company and leadership team." The analysts noted that "the delays and higher-than expected costs of getting Gander up and running is becoming

harder for investors to overlook," and noted that Gander stores "contributed an $8.9 million adjusted EBITDA loss in the quarter."

## IX.    THE TRUTH FULLY EMERGES

102.    On August 7, 2018, Camping World reported more disappointing financial results for the second quarter of 2018 ("2Q18") and lowered financial guidance for the remainder of 2018. The Company disclosed that it had achieved adjusted EBITDA of only $140.2 million for the quarter, 9% below its low-end guidance of $154 million, and that its adjusted EBITDA margin had again declined on a year-over-year basis from 11.1% in 2Q17 to 9.7% in 2Q18.

103.    Furthermore, on a conference call to discuss the 2Q18 results, Defendant Lemonis disclosed that Camping World was only on track to achieve 2018 adjusted EBITDA of $370 million to $380 million, a decline of 14% from prior guidance of $431 to $441 million. Lemonis and the Company revealed that the cause of the adjusted EBITDA miss and guidance reduction were related to the increased Gander costs, which were negatively impacting margins.

104.    In particular, Camping World disclosed "$15.4 million of preopening expenses related to [the] Gander Outdoors" store opening, which, combined with the 1Q18 pre-opening costs of $19.7 million, revealed that in just the first six months of 2018, the Company had already exceeded its full year pre-opening costs guidance of $30 million. An analyst commented to Lemonis that "it looks like Gander will be on the order of a $60 million EBITDA loss this year," to which Lemonis admitted, "Yes, sir."

105.    Upon this news, the price of Camping World Class A stock fell $3.17 per share, or 14%, on unusually high trading volume to close at $19.04 per share on August 8, 2018, and several analysts again slashed their price targets. For example, analysts from Wells Fargo

Securities cut their Camping World price target and noted that "investors are incrementally concerned over accelerated up-front 2018 Gander costs."

106.    In sum, from February 26, 2018 – when Camping World Class A common stock closed at $43.03 per share to August 8, 2018 – when Camping World Class A common stock closed at $19.04 per share, Camping World Class A common stock declined by $23.99 per share, or 56%. The price of Camping World Class A common stock has continued to decline to around $15 per share.

## X.    FORMER EMPLOYEE ACCOUNTS REGARDING GANDER

107.    Several former Camping World employees, who worked for Gander after Camping World purchased the stores out of bankruptcy, provided information in the Securities Class Action that gives further context for the allegations herein.  All references to their accounts below were obtained through review of the Securities Class Action's pleadings.

### A.    Selecting Poor Performing Gander Stores for Reopening

108.    Gander former employee 1 ("FE1") was a manager in the merchandising department who worked at Gander before and after the acquisition by Camping World. FE1 worked in Gander's corporate office and was responsible for merchandise planning.

109.    According to FE1, in or around May 2017, after the Gander acquisition was publicly revealed, he/she participated in conference calls with Lemonis and Gander's Marketing Director to discuss which Gander stores would be re-opened. FE1 said that Lemonis named a number of stores for which he was negotiating leases. Among the stores Lemonis named were those located in Paducah, Kentucky, and Florence, Alabama. FE1 was informed by Gander's VP of Operations that the VP of Operations had told Lemonis that these stores and other stores he

listed were poor performing Gander Mountain stores and that they should not be re-opened.[5] However, Lemonis decided to re-open both stores and both Gander stores have since been closed. The Paducah, Kentucky store was opened in February 2018 and closed in December 2018, and the Florence, Alabama store was opened in May 2018 and then quickly closed in September 2018, just months after it re-opened.

110.    Gander former employee 2 ("FE2") was a Senior Inventory Manager who worked for Gander from June 2017 to June 2018 overseeing inventory for all of the Gander brick-and-mortar stores and had previously worked at Gander Mountain for nearly a year before its bankruptcy. According to FE2, in June and July 2017 management for Gander held budgeting meetings to discuss the re-opening of the Gander stores. These meetings were attended by the VP of Merchandising, the VP of Operations, the VP of Inventory and Logistics (hereafter the "VPs"), Defendant Wolfe, and the President of Camping World, Roger Nuttall. During these budgeting meetings, the attendees discussed and were made aware that the closure of all the Gander Mountain stores made it challenging to recapture Gander customers who would shop elsewhere during the store closures and that the liquidation of all of Gander Mountain's inventory made stocking the new Gander stores with entirely new inventory time consuming and costly.

111.    According to FE2, in June 2017 he/she received a list of Gander stores Lemonis planned to open that was distributed internally and used to complete budget and revenue forecasting. This initial list of 70 Gander stores included locations that had historically performed poorly as Gander Mountain stores.

---

[5] On June 30, 2017, Camping World issued a release listing stores it was planning on opening, which included the Paducah, Kentucky store, and, on January 4, 2018, Camping World issued another release listing stores it was planning on opening, which included the Florence, Alabama store.

112.    Beginning in July 2017, FE2 would receive emails updating the list of Gander stores Lemonis planned to open and the order in which Lemonis planned to open those stores. In early July 2017, FE2 and others voiced concerns to the VP of Merchandizing when he/she saw high-performing stores taken off the list and low-performing stores being added. For example, in July 2017, when one of Gander Mountain's highest-performing stores, the Palm Beach store, was taken off the list of stores Lemonis planned to open, FE2 told the VP of Merchandising that the Palm Beach store was one of Gander Mountain's highest-performing stores and expressed worry that Gander was no longer planning to open this store. The VP of Merchandising told FE2 that Lemonis said the reason Gander was not opening the store in Palm Beach, Florida was that the city of Palm Beach would not allow Gander to sell RVs.[6] Gander ultimately did not re-open the Palm Beach store.

113.    According to FE2, from July 2017 to November 2017, he/she continued to voice concerns to the VPs about re-opening some of the lowest-performing Gander Mountain stores. When FE2 raised concerns to the VPs about opening certain low-performing stores he/she was told that Lemonis said it was "all about the leases."

114.    FE2's account regarding Camping World reopening underperforming and less profitable stores is similar to the fact that Camping World opened certain of the stores Gander Mountain itself had identified as "underperforming or unprofitable" in connection with the bankruptcy proceedings.[7]

---

[6] Lemonis' statement to the VP of Merchandising is corroborated by a May 12, 2017 tweet from Lemonis where, in response to a question about the "palm beach gardens" Gander location re-opening, Lemonis tweeted, "[t]he city said go away. No rvs will be sold here."

[7] For example, a Gander Mountain bankruptcy filing identified stores in Augusta, Georgia, Greenfield, Indiana, and Eau Claire, Wisconsin as "underperforming or unprofitable." *See In re:*

B.      **Technology Incompatibility and Inventory Disruptions[8]**

115.    According to FE2, in August 2017, employees for Gander started the process of entering the inventory of the high-volume retail Gander stores into the Camping World inventory system. To integrate the Gander products with the Camping World inventory system, Gander employees needed to enter into the system approximately 100,000 SKUs, the unique identifiers or codes for each product that captures its description, material, size, color, packaging, and warranty terms. According to FE2, SKUs are used by Gander to track inventory, order products, and invoice vendors.

116.    FE2 reported that inventory directors targeted early September 2017 for entering the majority of the SKUs needed to order and track inventory for the Gander stores into the Camping World inventory system. According to FE2, the majority of the SKUs had to be entered before buyers could purchase inventory and inventory could be shipped to the distribution center and delivered to the Gander stores for their re-opening.

117.    Gander former employee 3 ("FE3") was a Director for Gander from July 2017 to October 2018. FE3 developed merchandising and inventory strategy and oversaw the purchasing of inventory for the new Gander stores. FE3 reported to Gander's VP of Merchandising. According to FE3, in August 2017, he/she and others at Gander who were dealing with inventory and merchandising were trained on using the Camping World inventory system. FE3 said that he/she and others at Gander who were using the Camping World inventory system realized that

_____

*Gander Mountain Company*, Case No. 17-30673 (Bankr. D. Minn. March 10, 2017) at ECF No. 32. These stores were opened as Gander stores.

[8] On May 8, 2018, Lemonis discussed the disruption from buying new Gander inventory and integrating it into a new technology platform, referring to having "thousands of new vendors and you literally move all that product in on a brand-new operating system that you've never used before and then you have to move all that product out, it was kind of a giant sh** show."

the inventory system was not sufficient for Gander's high-volume retail needs. In particular, the Camping World inventory system required SKUs to be entered manually and did not have the capacity to input a high number of SKUs at once. In August 2017, FE3 told the VPs about the inadequacy of the Camping World inventory system informally as well as at weekly status meetings.

118.    According to FE2, during August and September 2017, Gander encountered additional problems with the Camping World inventory system and with entering the Gander SKUs into that system. FE2 said that Gander employees would manually enter SKUs into the system during the day and the SKUs were uploaded into the system overnight. However, as FE2 and others monitored the overnight progress of the SKU uploads into the inventory system, they saw that the inventory system often rejected some or all of the SKUs that were entered. Additionally, SKUs in the Camping World inventory system would become uncoupled from the products they were supposed to identify so that an SKU that was supposed to be identified with one product would instead be in the inventory system as an entirely different product.

119.    FE3 also confirmed that SKU data would be rejected or contain errors when it was uploaded into the Camping World inventory system.

120.    In August and September 2017, FE2 communicated to the VPs at weekly meetings the issues Gander was having uploading the SKUs into the inventory system. During those weekly meetings, FE3 also communicated to the VPs the problems Gander was experiencing with the inventory system. According to FE3, other Directors voiced the same concerns during these meetings.

121.    According to FE2, in August 2017, he/she and another Director recommended the VPs that Gander use the inventory system previously utilized by Gander Mountain or replace the

Camping World inventory system with a system that could handle Gander's retail inventory. Camping World did not heed this request.

122.    According to FE2, as a result of the problems entering the SKUs into the Camping World inventory system, there would be days in August and September 2017 when no SKUs could be loaded into the system. FE2 stated that, because of the delays caused by the problems with the inventory system, Gander missed the deadline for entering the SKUs into the system. FE2 said that, because the SKUs were not set up in the inventory system, Gander had to push back the ordering of inventory for the new Gander stores. FE2 initially planned to begin ordering inventory in early September 2017 so that inventory for the new stores could be shipped to the distribution center by late September 2017. Rather, according to FE2, Gander was not able to begin ordering inventory until October 2017 and inventory did not begin arriving at the distribution center until at least late October. At weekly meetings in September and October 2017, FE2 discussed with the VPs the delays in ordering inventory for the Gander stores and in the inventory being received at the distribution center.

123.    Additionally, FE2 recalls that in August 2017 he/she discussed inventory purchasing for the Gander stores with the VPs at weekly meetings. In particular, FE2 informed the VPs that Gander was purchasing inventory that, based on past sales data from Gander Mountain, had not previously sold. FE2 informed Gander's VP of Merchandising that a number of products were not selling and cautioned him on overstocking the Gander stores with inventory.

124.    According to FE2, in November 2017 he/she told Gander's VP of Merchandising that overstocking inventory and purchasing inventory that had not previously sold could result in items being placed on clearance, reducing the profit margins on those items and eating into the

sales of newly stocked merchandise. However, as FE2 recalls, Gander's VP of Merchandising and VP of Operations told FE2 to ship more inventory to the Ganders stores, and that Lemonis wanted the stores full.

### C.   Problems at the Gander Distribution Center

125.   In August 2017, according to FE2, Gander planned to ship $10-$12 million of inventory a week to the distribution center starting in the first week of October 2017. Gander planned to begin receiving inventory in the first week of October so that merchandise could be shipped to the new stores in time for their re-opening. Gander staffed the distribution center accordingly. FE2 said that the VPs discussed the plan to ship inventory and the staffing of the distribution center at weekly meetings he/she attended.

126.   However, as FE2 stated, the delay in ordering merchandise – due to the problems entering SKUs into the inventory system and the delay in purchasing inventory – caused Gander to order only approximately $1-$2 million per week in inventory by October 2017 and the distribution center did not begin receiving this inventory until mid-October 2017. Consequently, labor at the distribution center was cut back.

127.   According to FE2, when purchasing for the stores began in full, in late October/early November 2017, Gander was forced to order additional inventory in order to make up time. In November 2017, the distribution center was receiving $5-$10 million in inventory per week and this increased to $15-$20 million in inventory per week by December 2017. FE2, the VPs, management at the distribution center, and the inventory Directors, discussed at meetings throughout September to December 2017 the delays in ordering and shipping inventory to the distribution center and the fact that the distribution center was understaffed and ill equipped to handle the inventory shipments it was receiving.

128.    According to FE2, the distribution center did not have an inventory system that was adequately able to receive and process inventory beginning with the first deliveries in October 2017. Issues with the SKUs in the Camping World inventory system created a situation where inventory arrived but the SKUs for the inventory could not be found in the system or the SKUs did not match the inventory being received. Consequently, says FE2, many of the first shipments of inventory that arrived to the distribution center in October 2017 were not being received in the inventory system and pallets of inventory were being piled in a staging area for troubled orders while the problems with the orders were fixed, which could take weeks. FE2 relayed to the VPs the distribution center's problems with receiving inventory and the backlog it caused as the problems were occurring, multiple times a week, in October and November 2017.

129.    FE1 similarly reported that there were issues at the distribution center. According to FE1, there were not enough employees working at the distribution center to process the orders in time. FE1 also said that items were not properly set up in the Camping World inventory system.

130.    According to FE2, in October 2017, the issues at the distribution center led to problems with vendors as well. Because inventory was not being properly received in the inventory system when it was delivered to the distribution center, those at Gander responsible for paying vendors were not aware that the shipments were being delivered and vendors were not being paid for those shipments. In turn, vendors were refusing to ship additional inventory until the open purchase orders were paid. According to FE2, inventory managers were forced to call the distribution center and have them hunt down orders and enter them into the system as received so that vendors could be paid and new order shipped. According to FE2, this not only created delays in the distribution center but it caused Gander to miss discounted payment terms,

forcing Gander to pay full price on inventory shipments. FE2 discussed the issues with vendors caused by the distribution center with the VPs weekly at meetings and in informal discussions.

131.    According to FE3, in November 2017, he/she also experienced problems with the distribution center. The Camping World inventory system could not locate where inventory was located in the distribution center and could not forecast what inventory needed to be shipped to which stores without staff manually searching for the inventory in the system and inputting the information. FE3 also said that the Wi-Fi at the distribution center was so poor that the signal did not cover the entire facility and staff could not fill orders if they were outside the signal area. FE3 expressed these issues to the VPs at weekly meetings held with other Directors and through email communications.

132.    According to FE2, in November 2017, the distribution center was so backed up with deliveries there were trucks waiting at the distribution center to deliver merchandise. At one point, approximately 100 pallets were backlogged at the distribution center and had not been entered into the inventory system as received. In December 2017, before the Lakeville, Minnesota store opened, FE2 discussed the backlog of inventory at the distribution center with the VPs and Gander Regional Directors. According to FE2, at these meetings the VPs were told that inventory shipments were sitting for weeks and were given a daily count of backlogged pallets. FE2 said that the backlog of pallets had reached approximately 1,000 pallets by February 2018.

D.    **Delays in Gander Store Openings**

133.    According to FE3, because of the issues with the inventory system and the distribution center, Gander stores were not being shipped inventory timely and store openings were delayed.

134.    According to FE3, early in October 2017, Lemonis visited Gander headquarters in Bloomington, Minnesota. Lemonis was told that there were problems with getting product to the stores in time for opening. FE3 and others expressed to Lemonis that they needed more time and the opening of the Lakeville, Minnesota store was pushed back.

135.    FE2 was also present when Lemonis visited Gander headquarters in early October 2017 and addressed Gander employees. According to FE2, Gander Merchandising Directors asked Lemonis for more time to finalize inventory planning and were given an additional month by Lemonis. According to FE2, this caused delays in purchasing inventory and in opening the Lakeville, Minnesota store.

136.    FE2 also said that during Lemonis' visit to Gander headquarters in October 2017, a director asked Lemonis about inventory spending and Lemonis told the employee not to worry about inventory spending but instead to fill the stores and make the stores look good.

137.    According to FE3, the Gander store in Lakeville, Minnesota, was scheduled to open around Thanksgiving but was delayed until December 2017. Gander employees were told by Gander's VP of Operations that they needed to do whatever it took to open the Lakeville, Minnesota store. Employees from Gander headquarters staffed the Lakeville store in early December 2017 in order to set the store up in time for its December 13, 2017 opening.[9] According to FE3, Gander's VP of Operations told him/her that "Marcus [Lemonis] says we just have to do it."

---

[9] The Gander store in Lakeville, Minnesota, was the first Gander store to re-open after Camping World purchased Gander Mountain from bankruptcy. First Gander Outdoors to Open in Minnesota (Dec. 12, 2017), https://sgbonline.com/first-gander-outdoors-to-open-in-minnesota/.

138.     FE1 recalls that around Thanksgiving 2017, Camping World employees were flown in from different parts of the country to work at the distribution center to try and get the inventory shipped out for the opening of the Lakeville, Minnesota store.

139.     According to FE2, in November 2017, the manager of the distribution center discussed the need for more staffing at the distribution center with the VPs and Gander inventory directors during weekly meetings. FE2 said that he/she and others from Gander headquarters, as well as Gander employees at stores local to the distribution center's Lebanon, Indiana location, worked at the distribution center in order to assist with the opening of the Lakeville store in December 2017.

140.     According to FE2, when the Lakeville Gander store opened in December 2017, Gander used the inventory they had on hand at the distribution center to fill empty space so the store appeared full because they were not able to order, ship, and distribute the inventory merchandise that the store had planned to carry. FE2 said that the store was filled with duplicative products, products that were out of season, and whatever other inventory was available in the distribution center, including clearance Camping World merchandise. According to FE2, the VPs were aware of and approved this use of inventory to fill the store. In December 2017, prior to the Lakeville store opening, Gander VP of Merchandising told FE2 that the Lakeville store did not look full and instructed FE2 to ship more inventory to fill the store regardless of the inventory assortment plan for the store. For instance, FE2 recalled that Gander ordered an additional round of apparel, extra tackle boxes, additional shooting targets, additional camping tents, additional sleeping bags, and one extra pair of shoes of every size.[10] These

---

[10] The inventory described stands in stark contrast to Lemonis' statement on August 10, 2017 that "we will not carry the level of apparel and footwear that we historically have because we believe that, that is not as experiential. *It's more of a commodity-based business. And we want*

inventory items were chosen in part because they were large items which could fill space in the store. According to FE2, the inventory budget for the Lakeville store was approximately $2.8 million but the store opened in December 2017 with approximately $3.8 million of inventory.

141.    According to FE3, in December 2017 he/she also worked on the rollout of the Lakeville, Minnesota store and claimed that the Lakeville store was rushed and not ready to open when it did. FE3 recalled that the store suffered from IT issues, including that the point-of-sale system was not recognizing merchandise or pricing.

142.    According to FE1 and FE2, Lemonis was present at the opening of the Lakeville, Minnesota store on December 13, 2017.[11]

143.    FE1 stated that Lemonis arrived at the store on the afternoon of the opening and in a brief meeting at the front of the store with all store employees and members of the corporate office acknowledged that there were problems with the store but, according to FE1, said "let's just get the store open." According to FE1, Lemonis remained in the Lakeville store for approximately 2-3 hours and saw the point-of-sale issues. FE1 claimed that the problems with the point-of-sale system and pricing that Gander experienced at the Lakeville, Minnesota store persisted through the opening of the next 10 to 12 Gander stores.

144.    According to FE3, beginning in December 2017 with the Lakeville store, Gander's newly opened stores were selling approximately 40% of forecasted sales. FE3 stated that the Gander store sales figures were shared at weekly meetings he/she attended with all of the

---

*to carry the types of products and services that require human interaction with an expert and/or some level of installation or something you need just in time. That is our defense mechanism against margin compression* competing with Amazontype retailers."

[11] On December 13, 2017, Lemonis posted videos on his Twitter account (@marcuslemonis) of him at the Lakeville opening.

Gander Directors and the VPs. According to FE3, as additional Gander stores opened in 2018, the sales figures stayed consistently below forecast.

145.    According to FE2, other stores that Gander and Lemonis had originally intended to open in 2017 also had their opening dates delayed into 2018.

146.    FE1 stated that in the first part of 2018 the issues at the distribution center caused delays in many of the store openings. According to FE1, he/she, together with Gander's VP of Merchandising, Gander's VP of Operations, and other Gander managers, had facetime calls with Gander stores that were preparing to open. On those calls, the store managers walked aisle by aisle showing the lack of products on the shelves. FE1 stated that some of the stores with empty shelves were set to open in mere days.

147.    FE3 also reported that Gander stores continued to be postponed during January 2018 and through the Spring of 2018. According to FE3, in February 2018 he/she did store walk-throughs for stores that were planning to open and found that these stores also lacked inventory. As a result, Gander had to push back the openings for these stores and FE3 had inventory shipped directly to the stores. According to FE3, he/she had to obtain the approval of Gander's VP of Merchandising to perform the direct shipping.

## XI.    THE INDIVIDUAL DEFENDANTS HAD MOTIVE TO MAKE MATERIAL MISSTATEMENTS AND/OR OMIT MATERIAL FACTS

### A.    Insiders Sold Camping World Stock at Inflated Prices

148.    Defendants had a significant informational advantage and were uniquely situated, because of their private ownership of the Company before taking it public, to gain massive financial rewards by going public and representing the Company in a positive light during the periods following the IPO. Camping World had been a private company for decades prior to 2016. Defendants held significant stakes in Camping World but, because it was private, those

stakes were largely illiquid, and the IPO created an opportunity for liquidity. By listing Camping World Class A shares on a public exchange (the NYSE) but maintaining voting control through Class B and Class C shares, Defendants were able to control the Company while creating the opportunity to convert their ownership of Camping World into shares of Camping World Class A common stock, which could then be sold on the open market.

149.    On March 13, 2017, Camping World issued its false and misleading 2016 10-K. Defendants repeated substantially the same false and misleading statements in May and October 2017, concealing the Company's material weaknesses in internal controls and accounting errors. On May 1, 2017, Camping World announced the acquisition of Gander stores out of bankruptcy, and on May 8, 2017, Camping World announced that, "after reviewing the [Gander] stores in more detail since [Camping World's] success[ful] bid in the bankruptcy process, [Camping World's] current goal is to operate seventy or more, locations" that "have a clear path to profitability."

150.    Thereafter, as discussed above, Defendants continued to make false and misleading statements regarding the integration and rollout of Gander stores.

151.    Based on the reassuring statements, Camping World's stock price increased to $40 per share by October 10, 2017. Soon thereafter, on October 31 and November 1, 2017, Defendant Lemonis, through an entity controlled by him and Defendant Adams, sold over 800,000 shares of Camping World Class A stock at $40.50 per share for more than $32.4 million in gross insider sale proceeds. Then, on March 15, 2018 – just two weeks before the close of Camping World's disappointing 1Q18 – Defendant Lemonis sold an additional 130,000 shares of Camping World Class A stock at $35.51 per share for more than $4.6 million in additional gross proceeds.

152.    Additionally, Defendant Wolfe, Camping World's CFO, sold over $9 million worth of Camping World Class A shares from April 26, 2017 to September 27, 2017 at prices as high as $40.34 per share. Defendant Moody, Camping World's COO, sold over $16.8 million worth of Camping World Class A shares from April 26, 2017 to December 28, 2017 at prices as high as $46.17 per share.

153.    Non-Defendant executives who were closely involved in the disclosures set forth herein also sold a significant amount of stock. In particular, the President of Camping World, Roger Nuttall, sold over $13.8 million worth of Camping World Class A shares from June 26, 2017 to December 27, 2017 at prices as high as $45.92 per share.[12] Defendants also commenced two secondary public offerings, which, rather than focus primarily on raising more money to invest in the business, mainly allowed insiders to personally take full advantage of the liquidity opportunity.

154.    Many of the insider sales occurred at prices above $40, near the Relevant Period high and more than double the $19.04 per share price the shares had fallen to at the end of the Relevant Period, and far above the around $15 per share the stock trades at today.

155.    In sum, Defendants obtained more than $75 million in gross proceeds from their Relevant Period sales at inflated prices.

**B.    Defendants Conducted Due Diligence Prior to the Gander Acquisition and Closely Monitored the Rollout**

156.    The Gander acquisition was the largest single transaction by Camping World since it became public. Defendants were particularly cognizant of the adverse impact that bad inventory integration and management from the Gander acquisition would have on Camping

---

[12] Defendants Wolfe and Moody entered into Rule 10b5-1 trading plans during the middle of the Relevant Period and after the fraud had already begun.

World's profit margins. Defendant Lemonis, for example, has repeatedly advised business owners, on his television show The Profit, that good inventory management is one of the most important attributes of a successful business. Defendant Lemonis has stated that "the best place to start at any business that is struggling, you should start with inventory," that "you better have tight inventory controls" and that "[b]ad inventory management and the wrong inventory are the two things that kill companies."[13]

157.   Through the required due diligence prior to the acquisition of Gander, Defendants knew or recklessly disregarded the incompatibility of Camping World's inventory and distribution systems with Gander's retail business, and the SKU and distribution difficulties that the acquisition would create in transitioning from low-volume, high-priced RV inventory, to high-volume, low-priced Gander inventory. Moreover, Defendants closely monitored and discussed during every earnings call the rollout of Gander stores.

158.   Camping World's SEC filings reported that, as part of its RV acquisition strategy, the Company would "exchange confidential operational and financial information, conduct due diligence inquiries, and consider the structure, terms, and conditions of the potential acquisition." The SEC filings relatedly noted that "[p]otential acquisition discussions frequently take place over a long period of time and involve difficult business integration and other issues." Undoubtedly the same due diligence process would have been used for Gander. Further, the Gander Mountain bankruptcy court's "Bidding Procedures" required that Camping World and Gander Mountain enter into a confidentiality agreement and that Gander Mountain provide

---

[13]   Reportedly, in connection with The Profit, Lemonis has been sued by multiple small businesses owners who allege a range of misconduct on his part, including fraudulent inducement and unjust enrichment. *See Exclusive: 20 Business Owners Claim There's a Dark Side to Marcus Lemonis's Reality TV Show 'The Profit,'* INC.COM, https://www.inc.com/will-yakowicz/dark-side-of-marcus-lemonis-reality-tv-show-theprofit.html (last visited Aug. 5, 2019).

Camping World "available due diligence access" and make available any "information as may be reasonably requested" by Camping World. In turn, to submit a bid, Camping World was required to issue a statement that it "had an opportunity to conduct any and all due diligence regarding [Gander Mountain's] businesses and the Assets prior to submitting the bid." Due to the stark differences between Camping World's existing RV dealerships and Gander Mountain's large retail stores, any reasonable diligence by Camping World would have revealed the incompatibility of Camping World's inventory management and distribution systems and the inventory and distribution necessary to open and run Gander Mountain stores.

159.    Camping World's SEC filings stated that, as part of its RV acquisition strategy, the Company would "exchange confidential operational and financial information, conduct due diligence inquiries, and consider the structure, terms, and conditions of the potential acquisition." The SEC filings relatedly noted that "[p]otential acquisition discussions frequently take place over a long period of time and involve difficult business integration and other issues." Undoubtedly the same due diligence process would have been used for Gander. Moreover, the Gander Mountain bankruptcy court's "Bidding Procedures" required that Camping World and Gander Mountain enter into a confidentiality agreement and that Gander Mountain provide Camping World "available due diligence access" and make available any "information as may be reasonably requested" by Camping World. In turn, to submit a bid, Camping World was required to provide a statement that it "had an opportunity to conduct any and all due diligence regarding [Gander Mountain's] businesses and the Assets prior to submitting the bid." Due to the stark differences between Camping World's existing RV dealerships and Gander Mountain's large retail stores, any reasonable diligence by Camping World would have revealed the

incompatibility of Camping World's inventory management and distribution systems and the inventory and distribution necessary to open and run Gander Mountain stores.

160.    As set forth above, the Gander acquisition required moving thousands of new vendors and products to a new operating system that Camping World had not used, which was time-consuming and costly. In their roles as CEO and COO, Lemonis and Moody knew or recklessly disregarded this information learned in due diligence.

161.    Lemonis reiterated his close involvement in the Gander integration when he also told analysts that "[Moody] and I have really been at the forefront of negotiating those leases" and that they had "elected to pass" on certain stores. Moreover, Lemonis personally posted on Twitter about the opening of Gander stores, including a May 4, 2017 tweet in which he stated: "I will update what stores will continue here over the next 30 days @GanderMtn – we will follow the path to saving jobs and profitability." Lemonis thereafter posted lists of stores to be reopened and responded to inquiries on Twitter about the stores selected.

162.    Defendants also closely monitored the integration and inventory management of the Gander rollout. For example, Lemonis said they were being "calculated and disciplined . . . in how we manage this business" and that they had "aggressively negotiated rents [and] diversified the mix of merchandise." Lemonis later admitted the integration was a "giant sh[**] show" and that he had personally witnessed this when he visited the distribution center. Defendants were particularly cognizant of the negative impact that bad inventory management would have on Camping World's profit margins because, in Lemonis' words, "[b]ad inventory management and the wrong inventory are the two things that kill companies."

163.    Lemonis conceded that he picked the store locations to open and then reviewed "daily reports" on the stores. For example, after the Relevant Period, when Defendants closed a

Gander location in Florence, Alabama due to its lack of profitability, Lemonis admitted not only

that he was directly involved in and responsible for the selection of Gander stores to reopen, but

also that he monitored – in detail – the opening and performance of the Gander stores, stating:

> I think in that particular case, I take the blame for any location that we picked. Florence, Alabama looked like it had a clear path to profitability.[14] And after 4, 5 months of reviewing the daily reports, the foot traffic, all of the things, I wasn't satisfied with the rate that it was even moving at. And I did not want to burn another dollar for another day. . . .
>
> I am also closely monitoring other locations in a similar fashion that I managed, that I monitored Florence. We haven't made any conclusive decisions yet, but I'm not opposed to any of them. . . . So I would just say, it was my fault. I went back to a location out of the 160. I picked one that was wrong. It was my fault.

164.     As set forth above, former employees have affirmed that Defendants and/or those

reporting to them were involved in and closely monitored the selection, integration, and rollout

of Gander stores and were aware of the integration and rollout failures.

165.     The disparity between the reassuring assessment of integration in the false and

misleading statements and the truth, as revealed at the end of the Relevant Period, further

indicates a strong inference of scienter. For example, Defendants initially claimed that they

expected to open 15 to 20 Gander stores by the end of 2017. However, due to the rampant

inventory and distribution issues, Camping World had opened just two Gander stores by the end

of 2017. Further, during the August 10, 2017 earnings call, Lemonis estimated that it would cost

approximately $20 million in pre-opening expenses to open 55 Gander stores. However, again

because of the rampant inventory and distribution issues, Camping World had expended more

than $25 million in pre-opening expenses by the end of 2017 alone, with just two stores open. By

the time Camping World had opened approximately 55 Gander stores, the Company had spent

---

[14] As explained by FE1, the Florence, Alabama location was a poor-performing Gander Mountain store and should not have been reopened.

over $61 million in pre-opening expenses, more than triple the initially reported $20 million. Camping World has yet to open the more than 70 Gander stores Defendants originally claimed, rather, Camping World has closed stores opened after only a few months despite promising to target the most profitable stores and inventory, and Lemonis conceded the Gander stores would result in $60 million in adjusted EBITDA losses in 2018. The disparity between what was occuring and what Defendants reported indicates a strong inference of scienter, particularly given that Lemonis had repeatedly promised investors that "we only put numbers out there that we know we can hit," which further shows his direct monitoring of the factual details behind his public statements.

### C.   Defendants' Reckless Disregard for Internal Controls and Accurate Financial Reporting

166.   As the senior executives and directors of a publicly traded company, the Individual Defendants knew the existence of any material weakness in the Company's internal controls or any deficiency in its disclosure controls would be material to public investors as it would immediately call into question the Company's accounting and financial statements. For example, the definition of a material weakness is a

> significant deficiency, or combination of significant deficiencies, that result[ed] in more than a remote likelihood that a material misstatement of the annual or interim financial statements w[ould] not be prevented or detected.

167.   As of March 8, 2017, Camping World suffered several material weaknesses in its internal controls, which resulted in the overstatement of EPS and net income by as much as 37%.

168.   Displaying their reckless disregard for the Company's controls, accounting, and financial reporting, Defendants Lemonis and Wolfe signed certifications throughout the Relevant Period stating they had evaluated the Company's internal controls and procedures and that these controls and procedures were effective and that Camping World's financial reporting was

accurate and free from fraud. Further, the 2016 10-K, 1Q17 10-Q, 2Q17 10-Q, and 3Q17 10-Q all stated that the Company's "management, with the participation of our Chief Executive Officer and Chief Financial Officer, evaluated, as of the end of the period . . . the effectiveness of [Camping World's] disclosure controls and procedures." And the 2016 10-K further stated that Camping World had dedicated "significant resources and management attention" to the Company's internal controls and procedures.

169.    Displaying further disregard, Defendants were on notice that the Company lacked reliable accounting infrastructure and controls prior to March 8, 2017. In particular, the FY 2016 Release issued on that date stated that "[i]n connection with the preparation of the financial statements for the year ended December 31, 2016, errors were identified within the elimination of intercompany revenue, costs, operating expenses, and profit in ending inventory," which caused Camping World to revise certain fourth quarter 2015 financial results.

170.    All the Individual Defendants had served as senior managers or directors of the Company before the IPO and had close familiarity with the Company's accounting policies, procedures, and controls and further developed this familiarity and knowledge in preparation for the IPO and in the first year thereafter. As senior managers and directors of the Company before and after the IPO, all the Individual Defendants knew or recklessly disregarded the accounting errors described in the FY 2016 Release. Notably, the error in "elimination of intercompany revenue" identified in the FY 2016 Release was substantially the same as the error in "elimination of intercompany allocation of certain revenue" identified in the FY 2017 Release a year later.

171.    Additionally, several of the material weaknesses in the Company's internal controls arose from the FreedomRoads segment, which Lemonis had co-founded and run for

more than a decade, which Defendant Adams was the Chairman of for more than a decade, and which Defendant Moody was an Executive Vice President of for nearly a decade. In particular, the Company admitted that "certain accounting policies and procedures related to corporate accounting functions within FreedomRoads . . . were not sufficiently documented and/or executed to be considered effective," "communication to those executing transactions and performing corporate review functions at FreedomRoads was not sufficiently performed to ensure internal control responsibilities were properly reinforced," and "information used by FreedomRoads to analyze trade-in inventory included inaccurate or incomplete data."

172.    The existence of prior accounting errors (and in particular prior errors similar to those ultimately disclosed), the Individual Defendants' long-standing experience with the Company and the segments that suffered the errors and weaknesses, the Individual Defendants' representations to the market, and the magnitude and scope of the errors, indicate that the Individual Defendants knew or recklessly disregarded the true facts disclosed toward the end of the Relevant Period.

### D.    Defendant Lemonis' Admissions Regarding His Disclosure Failures

173.    Defendant Lemonis ran Camping World as a private company for years and was used to doing what he wanted without any disclosure obligations. In order to partially cash out insiders, Defendants wanted access to the public markets, but without responsibility to investors. That was evident from the structure of the IPO, which spread the economic risk but kept control tightly held.

174.    Furthermore, on the May 8, 2018 conference call wherein Defendants admitted certain negative facts that had been concealed, Defendant Lemonis reflected his indifference to whether the stock price fluctuated based on speculation from lack of disclosure, stating:

I kind of didn't really care about anything other than making sure that I didn't break that plan and I didn't break make my people, and I didn't break the process or the customer experience. And if the net result was that people speculated about the health of the company and drove the stock down and wrote all sorts of crazy things about what the company is doing, I kind of didn't really care because at the end of the day, I know this business better than anybody that will ever write about it, ever. And I know exactly what works and doesn't work.

175.    A month later, during a June 6, 2018 investor conference, Defendant Lemonis was more yielding and seemingly admitted that Defendants had not provided the full and accurate disclosures to investors required of a public company, stating in pertinent part:

[M]e and not the rest of the team have to do a better job of understanding the transition from private company to public company and understanding how to share that strategy. Because I am used to holding all my cards so I can sucker punch my competitors.

I realize now that I need to give you enough information so you understand why capital is being deployed, why things are being done, so that it doesn't create mistrust or it doesn't create confusion. So I think that really falls on me to do a better job in that regard.

176.    Later in June 2018, Defendant Lemonis held an interview with Jim Cramer, host of the "Mad Money" investment show on CNBC, and again admitted that, "in being a public company there was a big transition from being private, and I would say that I've really learned, made some rookie mistakes in how to communicate to the market."

177.    Defendant Lemonis' statements regarding his preference for secrecy further support a strong inference that it was his conscious decisions, not lack of information, which caused the false and misleading statements.

## XII.   DUTIES OF THE INDIVIDUAL DEFENDANTS

### A.    Fiduciary Duties

178.    By reason of their positions as officers, directors, and/or fiduciaries of Camping World, and because of their ability to control the business and corporate affairs of Camping

World, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Camping World in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Camping World and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

179.    Each director and officer of the Company owes to Camping World and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

180.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

### B.    Audit Committee Duties

181.    In addition to these duties, the members of the Audit Committee owed specific duties to Camping World, under the Audit Committee's Charter, to review and approve quarterly and annual financial statements and earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.

182.    Specifically, according to Camping World's Audit Committee Charter, the Audit Committee's responsibilities include the principal functions of assisting the Board in its oversight duties and in this capacity:

> The purpose of the Audit Committee (the "Committee") is to assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the

Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the performance of the Company's independent auditor; and (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established.

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

*       *       *

## IV. Duties and Responsibilities

*Interaction with the Independent Auditor*

1.      *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including oversight of the resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

2.      *Appointment and Oversight*. The Committee is directly responsible for the appointment, compensation, retention and oversight of the work of the independent auditor (including oversight of the resolution of any disagreements between Company management and the independent auditor regarding financial reporting) and any other registered public accounting firm engaged for the purpose of preparing or issuing an audit report or related work or performing other audit, review or attest services for the Company, and the independent auditor and each such other registered public accounting firm must report directly to the Committee. The Committee, or the Chair of the Committee, must pre-approve any audit and non-audit service provided to the Company by the independent auditor, unless the engagement is entered into pursuant to appropriate preapproval policies established by the Committee or if such service falls within available exceptions under SEC rules.

3. *Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

4. *Form 10-K Review*. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

5. *Audit Committee Report*. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

*Quarterly Financial Statements*

6. *Form 10-Q Review*. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

*Other Duties and Responsibilities*

7. *Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

8. *Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management.

9. *Hiring of Independent Auditor Employees*. The Committee must set clear hiring policies for employees or former employees of the Company's independent auditor.

10. *Complaint Procedures*. The Committee must establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

11. *Review of Related Person Transactions*. The Committee must review all related person transactions as defined by Item 404 of Regulation S-K on an ongoing basis and all such transactions must be approved or ratified by the Committee.

12.    *Reports to the Board of Directors*. The Committee must report regularly to the Board regarding the activities of the Committee.

13.    *Committee Self-Evaluation*. The Committee must at least annually perform an evaluation of the performance of the Committee.

14.    *Review of this Charter*. The Committee must periodically review and reassess this Charter and submit any recommended changes to the Board for its consideration.

183.    Upon information and belief, the Company maintained an Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on the members of the Audit Committee as those set forth above.

**C.    Duties Pursuant to the Company's Code of Conduct and Ethics**

184.    Additionally, the Individual Defendants, as officers and/or directors of Camping World, were and are all bound by the Company's Code of Ethical Business Conduct (the "Code").  Specifically, it states the following:

> As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

> The Company's principal financial officers and other associates working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These associates must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

185.    Upon information and belief, the Company maintained a version of the Code during the Relevant Period that imposed the same, or substantially and materially the same, or similar, duties on, among others, the Board as those set forth above.

### D.     Control, Access, and Authority

186.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Camping World, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Camping World.

187.    Because of their advisory, executive, managerial, and directorial positions with Camping World, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Camping World.

188.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Camping World, and was at all times acting within the course and scope of such agency.

### E.     Reasonable and Prudent Supervision

189.    To discharge their duties, the officers and directors of Camping World were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Camping World were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Camping World conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Camping World was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## XIII.   BREACHES OF DUTIES

190.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Camping World and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Camping World, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Camping World, the absence of good faith on their part, and a reckless disregard for their duties to Camping World and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to Camping World.

191.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make

false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

192.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws. As a result, Camping World has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

193.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

194.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

195.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties and unjust enrichment; and (b) disguise and misrepresent the Company's actual business and financial prospects.

196.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the

authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

197.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## XIV.  DAMAGES TO CAMPING WORLD

198.    As a result of the Individual Defendants' wrongful conduct, Camping World disseminated false and misleading statements, and omitted material information to make such statements not false and misleading when made. The improper statements have devastated Camping World's credibility. Camping World has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

199.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Camping World's market capitalization has been substantially damaged, having lost millions of dollars in value as a result of the conduct described herein.

200.    Further, as a direct and proximate result of the Individual Defendants' conduct, Camping World has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred in investigating and defending Camping World and certain officers in the pending Securities Class Action, plus potentially millions of dollars in settlement or to satisfy an adverse judgment;

(b) costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on Camping World's artificially inflated stock price; and

(c) costs incurred from the loss of the Company's customers' confidence in Camping World's products.

201.    Moreover, these actions have irreparably damaged Camping World's corporate image and goodwill. For at least the foreseeable future, Camping World will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Camping World's ability to raise equity capital or debt on favorable terms in the future is now impaired.

202.    Moreover, the use of proprietary, non-public information concerning the Company's business and prospects by the above Defendants who sold all or part of their shares throughout the Relevant Period was done for their own self-interests, at the expense of Camping World and the investing public.

## XV.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

203.    Plaintiff brings this action derivatively in the right and for the benefit of Camping World to redress injuries suffered, and to be suffered, by Camping World as a direct result of the violations asserted herein by the Defendants.  Camping World is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

204.    The Board of Camping World, at the time this action was commenced, consisted of Defendants Lemonis, Adams, Baltins, Cassidy, George, Kosick, Marcus, Schickli, and Moody, a total of nine (9) individuals.

205.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Camping World Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

### A.     Demand is Futile as to Defendant Lemonis Because His Principal Professional Occupation as the Company's CEO

206.     Defendant Lemonis is the Company's CEO, and Chairman of the Board director since the Company's IPO.  In his role as CEO of the Company for the fiscal years 2016, 2017, and 2018 Defendant Lemonis received $5,063,346, $14,272, and $9,109 in total compensation respectively.  The Company does not claim that Defendant Lemonis is an independent director and because his primary source of income and primary employment is his employment as President and CEO of Camping World and his professional reputation is inextricably bound to his role at Camping World, Defendant Lemonis is incapable of acting independently and demand is futile upon him.

### B.     Demand is Futile as to the Audit Committee Defendants

207.     Demand is futile as to Defendants Kosick and Schickli (collectively, the "Audit Committee Defendants") as the members of the Audit Committee for their knowing failure to fulfill their responsibilities.

208.     The Board of Directors adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee.  The Audit Committee Charter notes that the purpose of the Audit Committee shall be to "assist the Board in its oversight of: (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal and regulatory requirements; (iii) the independent auditor's qualifications and independence; (iv) the

performance of the Company's independent auditor; (v) the design and implementation of the Company's internal audit function, and the performance of the internal audit function after it has been established."

209.    Specifically, the Audit Committee Charter notes that the Audit Committee is responsible for "establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Company's financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements."

210.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

211.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information concerning the Company's Gander stores integration setbacks.  In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.  Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

C.      **Demand is Futile Because a Majority of the Board Could Not Have Exercised Disinterested and Independent Business Judgment in Considering a Demand**

212.    Demand is excused because more than half of the Company's current Board of Directors face a substantial likelihood of personal liability in connection with the above misconduct.

213.    The Board of Camping World, at the time this action was commenced, consisted of Defendants Lemonis, Adams, Baltins, Cassidy, George, Kosick, Marcus, Schickli, and Moody, a total of nine (9) individuals.

214.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

215.    Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

216.    In addition, as set forth above, by way of their respective roles in the Company, Defendants Lemonis, Adams, Cassidy, Marcus, and Moody, were able to, and did, determine the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Relevant Period. In addition, Defendants Lemonis, Adams, Cassidy, Marcus, and Moody had access to material, non-public information and were uniquely situated due to their private ownership and control of the Company prior to the IPO to gain enormous

financial rewards by going public and portraying the Company in a positive light during the periods following the IPO when they could sell their personal Camping World stock. Indeed, these Defendants had extensive familiarity with the Company's accounting policies, procedures and controls and further developed this familiarity and knowledge in preparation for the IPO and thereafter.

217.    As detailed above, members of the Company's Board and members of the Company's senior management made trades of Company stock based on inside information not available to the investing public and other shareholders.

218.    Defendants Cassidy and Marcus, as a result of their positions with Crestview, stood to profit personally from the sale of Camping World stock but would also face a materially detrimental impact if this litigation, including the allegations of Crestview's insider trading, were pursued by the Camping World board. A decision by the Camping World Board to bring suit against Crestview for insider trading would have potentially significant adverse consequences for Cassidy and Marcus that disables Cassidy and Marcus from impartially considering a presuit demand by Plaintiffs.

219.    Similarly, Defendants Lemonis, Adams and Moody would face a materially detrimental impact if this litigation, including the allegations of concerning their insider trading, were pursued by the Camping World board. A decision by the board to bring suit against Lemonis, Adams and Moody for insider trading would have potentially significant adverse consequences for each of them that disables them from impartially considering a pre-suit demand by Plaintiffs.

220. Due to the fact that the above Defendants would face personal liability, these directors cannot be expected to exercise independent business judgment when considering whether or not to pursue this litigation.

221. Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

## COUNT I

### Against Defendants Baltins, Marcus, Cassidy, Kosick, Lemonis, Adams, George, and Schickli for Violation of Section 14(a) of the Securities Exchange Act of 1934 and Rule 14a-9 Promulgated Thereunder

222. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

223. Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's 2015 and 2016 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material information regarding the wrongdoing of defendants as detailed above, and included by reference materially false and misleading financial statements.

224. Defendants Baltins, Marcus, Cassidy, Kosick, Lemonis, Adams, George, and Schickli negligently issued, caused to be issued, and participated in the issuance of materially false and misleading written statements to stockholders that were contained in the 2018 Proxy. The 2018 Proxy contained proposals to the Company's stockholders that they vote to reelect

certain members of the Board. The 2018 Proxy, however, misrepresented and failed to disclose and explain that: (i) there were several material weaknesses in the Company's controls over financial reporting, resulting in an overstatement of the Company's financials; and (ii) the Company's integration and rollout of Gander stores was experiencing difficulties, with substantially higher costs that were negatively impacting the Company's profit margins by tens of millions of dollars.

225.    By reasons of the conduct alleged herein, defendants Baltins, Marcus, Cassidy, Kosick, Lemonis, Adams, George, and Schickli violated section 14(a) of the Exchange Act. As a direct and proximate result of the violation, stockholders voted in favor of electing certain Defendants to the Board. Defendants Baltins, Marcus, and Moody's reelection contributed to the continuation of the wrongful practices described herein.

226.    In the exercise of reasonable care, defendants should have known that 2018 Proxy contained misleading information and/or omitted material information.

227.    The misrepresentations and omissions in the 2018 Proxy were material to Company shareholders in voting on the 2018 Proxy.

228.    The Company was damaged as a result of Defendants' material misrepresentations and omissions in the 2018 Proxy.

229.    Plaintiff, on behalf of Camping World, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of Defendants Baltins, Marcus, and Moody based upon the false and misleading 2018 Proxy.

**COUNT II**

**Against the Individual Defendants for Contribution Under Section 10(b) of the Exchange Act, Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

230.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

231.    As a result of the conduct and events alleged above, Camping World has been named as a defendant in the Securities Class Action brought on behalf of Camping World shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

232.    Federal law provides Camping World with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Camping World has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Camping World to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Securities Class Action, and sets forth specific rules regarding the determination of claims for such contribution.

233.    Accordingly, Plaintiff, on behalf of Camping World, hereby claims contribution against the Individual Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Camping World under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Camping World.

234.    Camping World claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

## Allegations Regarding the Individual Defendants

235.    Throughout the Relevant Period, the Individual Defendants caused the Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's financial performance, the effectiveness of internal controls to ensure accurate financial reporting, and the success and profitability of the integration and rollout of Gander Mountain stores.  These statements were materially misleading to persons who purchased Camping World securities during the Relevant Period.  In particular, the SEC filings and other public statements created the false impression that, *inter alia*, the Company's internal controls were effective and the integration and rollout of Gander Mountain stores was proceeding smoothly, when instead, the Individual Defendants failed to disclose that: (i) there were several material weaknesses in the Company's controls over financial reporting, resulting in an overstatement of the Company's financials; and (ii) the Company's integration and rollout of Gander stores was experiencing difficulties, with substantially higher costs that were negatively impacting the Company's profit margins by tens of millions of dollars.

236.    The plaintiffs in the Securities Class Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Camping World securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

237.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

238.    The plaintiffs in the Securities Class Action were unaware of the false and misleading nature of said statements and omissive disclosures.

239.    When the Individual Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Camping World, the Individual Defendants were privy to information regarding the Company's financial prospects and internal controls, and would have been well aware the ongoing issues at the Company.

240.    Accordingly, the Individual Defendants are liable for damages under Section 10b of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Camping World were to be held liable in the Securities Class Action, the Individual Defendants would be liable to it for contribution.  Plaintiffs hereby derivatively claim such right of contribution on behalf of Camping World.

### Allegations Regarding the Individual Defendants as Control Persons

241.    In acting as alleged above, the Individual Defendants were acting as authorized agents of Camping World in their roles as directors and/or employees.  Because of their positions of control and authority as senior officers and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

242.    The Individual Defendants were "controlling persons" of Camping World within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Individual Defendants could be held liable to the plaintiffs in the Securities Class Action.  Were the Company to be

held liable in said Securities Class Action, the Individual Defendants would be liable to it for contribution.

## COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

243.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

244.    The Individual Defendants owed and owe Camping World fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants, owed and owe Camping World the highest obligation of good faith, loyalty, and due care.

245.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Camping World shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

246.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Camping World to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Camping World and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

247.    As a direct and proximate result of their failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

248.    Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

249.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

250.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Camping World.

251.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Camping World.

252.    Plaintiff, as a shareholder and representative of Camping World, seeks restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Individual Defendants from their wrongful conduct and breaches of fiduciary duty.

253.    Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Abuse of Control

254.    Plaintiff incorporate by reference and realleges each and every allegation contained above, as though fully set forth herein.

255.    The Individual Defendants have taken advantage of their positions as officers and/or directors of the Company to the detriment of Camping World and the investing public by causing the Company to issue materially misleading statements and/or omitting material information concerning the Company's Gander stores integration setbacks.

256.     As such, the Individual Defendants have abused their positions of control with the Company and are legally responsible.

257.     Thus, for the aforementioned reasons, the Individual Defendants are liable to the Company for their wrongdoing.

**COUNT VI**

**<u>Against the Individual Defendants for Gross Mismanagement</u>**

258.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

259.     The Individual Defendants owed a duty of oversight to the Company in which they were responsible to ensure that the Company maintained adequate reporting controls for all financial, accounting and disclosure released by the Company. Furthermore, the Individual Defendants were responsible to oversee, manage and control the operations of the Company, including the manners and methods of reporting in which the acts complained herein occurred.

260.     Through the wrongful acts complained of herein, the Individual Defendants refused or did not properly discharge their responsibilities to the Company and its shareholders in a prudent manner as prescribed by law as well as in the Company's corporate governance regulations.

261.     By committing the misconduct alleged herein, the Individual Defendants breached their fiduciary duties of due care, diligence and candor in the management and administration of Camping World's affairs and in the use and preservation of Camping World's assets.

262.     During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Camping World to engage in the conduct complained of herein

which they knew had an unreasonable risk of damage to Camping World, thus breaching their duties to the Company.

263.    As a result, the Individual Defendants grossly mismanaged Camping World and should be liable to the Company for the resulting damages.

### COUNT VII

**Against Defendants Lemonis, Adams, Moody, Wolfe,
and the Crestview Defendants for Breach of Fiduciary
Duties for Insider Selling and Misappropriation of Information**

264.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

265.    By reasons of their positions as directors and/or officers of Camping World, Defendants Lemonis, Adams, Moody, and Wolfe each owe Camping World a duty of loyalty and care. Defendant Crestview, by reasons of its control of Camping World through its ownership of stock, its ability to designate directors of Camping World's Board and the Voting Agreement owes a fiduciary duty of loyalty and care to Camping World. In addition, Crestview stands in a relationship of trust and confidence with Camping World because two of Crestview principals, Cassidy and Marcus, serve as directors on the Company's Board of Directors (where they have access to nonpublic, confidential information) and also serve on the Investment Committee of Crestview.

266.    Each of the above Defendants, during the Relevant Period, engaged in the sale of Company stock while in possession of material information that had yet to be released to the investing public. Furthermore, these defendants participated in the scheme to keep the public unaware of the adverse information affecting the Company's stock price and benefited to the detriment of the investing public and the Company itself.

267.    The information that was yet unreleased concerned problems experienced by the Company's deteriorating infrastructure and equipment.

268.    This proprietary, non-public information concerning the Company's business and prospects was known by the above Defendants who sold all or part of their shares throughout the Relevant Period and was done for their own self-interests, at the expense of Camping World and the investing public.

269.    By selling the Company's common stock while in possession of this information and failing to fully inform the investing public, the above Defendants breached their fiduciary duties of good faith and loyalty to the Company.

270.    As such, the above Defendants are legally responsible to the Company for the significant profits they received from the sales of their stock in Camping World.

271.    Plaintiff, on behalf of Camping World, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Camping World and that Plaintiff is an adequate representative of the Company

B.    Determining and awarding to Camping World the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Camping World to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws, and to protect Camping World and its shareholders from a repeat of the damaging events described herein,

including but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation, and taking such other action as may be necessary to place before shareholders for a vote the following corporate governance proposals or policies:

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- a proposal to strengthen the Company's internal reporting and financial disclosure controls;

- a provision to permit shareholders of Camping World to nominate a majority of the candidates for election to the Board to replace existing directors;

- a proposal to develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a proposal to ensure the accuracy of the qualifications of Camping World's directors, executives, and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention, and treatment of complaints received by the Company regarding internal controls; and

- a provision to appropriately test and then strengthen the Company's internal operational control functions;

D.      Awarding to Camping World restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Individual Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: August 6, 2019

**O'KELLY ERNST & JOYCE, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esq. (#4788)
901 N. Market Street, Suite 1000
Wilmington, DE 19801
Phone (302) 778-4000
Email: rernst@oelegal.com

*Attorneys for Plaintiff*

**LIFSHITZ & MILLER LLP**
Joshua M. Lifshitz
821 Franklin Avenue, Suite 209
Garden City, New York 11530
Telephone: (516) 493-9780
Facsimile: (516) 280-7376